# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

DENNIS L. MONTGOMERY
Miami, Florida[1]

                    Plaintiff,

    v.

AMERICAN CIVIL LIBERTIES FOUNDATION
ACLU
125 Broad Street, 18th Floor
New York, New York 10004


          and                         Civil Action No. _____

SUSAN N. HERMAN, ESQ.
President
ACLU
125 Broad Street, 18th Floor
New York, New York 10004


          and

CECILLIA D. WANG, ESQ.
ACLU
Immigrants' Rights Project
39 Drumm Street
San Francisco, California 94111


          and

DANIEL J. POCHADA, ESQ.
ACLU of Arizona
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014


          and

MICHAEL "MIKE" GERMAN, ESQ.
ACLU
125 Broad Street, 18th Floor
New York, New York 10004

---

[1]      Street address not listed for security reasons.

and

ANDRE IVAN SEGURA, ESQ.
ACLU
125 Broad Street, 18th Floor
New York, New York 10004

and

JOSHUA BENDOR
ACLU
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014

Defendants.

## **COMPLAINT**

Plaintiff Dennis L. Montgomery, by counsel, sues the Defendants, jointly and severally, in this civil action for Breach of Fiduciary Duty, Professional Malpractice, Common Law Defamation *Per Se*, General Defamation, Defamation by Implication and Intentional Infliction of Emotional Distress.  As grounds therefore, Plaintiff alleges as follows:

## I.     **JURISDICTION AND VENUE**

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 under diversity of citizenship. The parties are citizens of different states and the amount in controversy exceeds $75,000.

2.      Venue is proper for Defendants pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(e).

## II.    **THE PARTIES**

3.      Dennis L. Montgomery is a natural person, an individual, a citizen of the United States and is a citizen of Florida.

2

4.      Defendant American Civil Liberties Union Foundation ("ACLU") by its own description: "is a 501(c)(3) organization that provides legal representation free of charge to individuals and organizations in civil rights and civil liberties cases, and educates the public about the civil liberties implications of pending and proposed state and federal legislation, provides analyses of pending and proposed legislation, directly lobbies legislators, and mobilizes its members to lobby their legislators."

5.      Defendant Cecillia D. Wang, Esq., is an individual who is an attorney employed by and working for the ACLU, admitted to the bar in the State of California and also appears *Pro Hac Vice* in the State of Arizona in *Melendres v. Arpaio*, Civil Action No. CV-07-2513-PHX-GMS, in the U.S. District Court for the District of Arizona.

6.      Defendant Daniel Pochoda, Esq., is an individual who is an attorney employed by and working for the ACLU, admitted to the bar in the State of Arizona and also appears as counsel in *Melendres v. Arpaio*.

7.      Defendant Michael ("Mike") German, Esq., is an individual who is an attorney employed by and working for the ACLU, and the other Defendants, acting in concert, on information and belief, admitted to the bars in the State of New York and the District of Columbia who on behalf of the ACLU consulted with Dennis Montgomery, provided legal advice to Montgomery, directed Montgomery to take action, and engaged in an attorney-client relationship on behalf of the ACLU, along with the other individual Defendants, with Plaintiff.

8.      Defendant Susan N. Herman, Esq., is the current President of the ACLU and upon information and belief, resides in New York and is a member of the bar in the State of New York. She acted in concert with the other Defendants herein and had full knowledge of the facts and circumstances set forth in this Complaint, particularly since Plaintiff's activities as a

whistleblower involve matters of great national security interests. The ACLU represents whistleblowers like Plaintiff, such as Edward Snowden, and has brought lawsuits that attempt to seek redress for the illegal and unconstitutional actions of the National Security Agency ("NSA") and other U.S. Government intelligence agencies in spying indiscriminately on the American people without regard to any probable cause that they are in contact with terrorists. *See American Civil Liberties Union v. Clapper*, Case no. 14-42. U.S. Court of Appeals for the Second Circuit, Decided May 7, 2015.

9.    Defendant Andre Ivan Segura is an individual who is an attorney employed by and working for the ACLU, admitted to the bar in New York and also appears *Pro Hac Vice* as counsel in *Melendres v. Arpaio*.

10.    Defendant Joshua Bendor is an individual who is an attorney employed by and working for the ACLU, is a member of the bar of Arizona and is one of the counsel for Plaintiffs in *Melendres v. Arpaio*.

11.    All of the allegations and counts of this Complaint refer or relate to the tortious, illegal conduct of each and every named Defendant, who acted individually and in concert, jointly and severally, to severely damage Plaintiff Montgomery.

### III.    FACTS COMMON TO ALL COUNTS

12.    Plaintiff Montgomery sues for harm and damages in this district, Florida, and nationwide to himself as an individual and person, including for financial harm to his individual business reputations and his individual and business and professional opportunities, his ownership of intellectual and other property rights, breach of fiduciary duty, the loss of legal rights through Defendants actions and failure to act on his behalf as his counsel, and defamation.

13.    Plaintiff is in poor health and requests expeditious handling of the lawsuit.

14.    The Plaintiff sought legal assistance from the ACLU starting in early June 2013.

15.    Dennis Montgomery consulted with the ACLU and the other Defendants herein, including but not limited to the ACLU's lead litigation attorney, Mike German, at the ACLU's national headquarters, with regard to his efforts as a whistleblower having information about the unconstitutional and illegal acts by the National Security Agency ("NSA"),  the Central Intelligence Agency ("CIA") and other U.S. Government intelligence agencies.

16.    Trusting in an attorney-client relationship, Dennis Montgomery disclosed to the ACLU and the other Defendants confidential information, identified legal issues of concern, and asked for and received legal advice.

17.    The Plaintiff entrusted to the ACLU information about government abuses potentially more egregious than those that Edward Snowden revealed.

18.    But unlike Snowden, Montgomery sought and seeks to come forward legally and through proper channels.  Addressing those abuses through proper legal and governmental channels was the primary reason for Montgomery entering into an attorney client relationship with the ACLU and the other Defendants herein.

19.    Because the ACLU, Mike German and the other individual Defendants, acting in concert, consulted with and gave Dennis Montgomery legal advice and an evaluation of his legal risks and situation and asked for actions to further future legal and other actions by the ACLU on Montgomery's behalf, an attorney-client relationship was actually established with each and every one of the Defendants and a duty of care and fiduciary duty was owed to Plaintiff by each of the Defendants.

20.    The ACLU, Mike German and the other individual Defendants, acting in concert, specifically requested that Dennis Montgomery send the ACLU even more information and

documentation so that the ACLU could further their legal representation of Montgomery.  The ACLU, German and the other Defendants, acting in concert, gave Montgomery legal advice, including advice they told Plaintiff would further his interests and the public in blowing the whistle on illegal and unconstitutional acts by the NSA, CIA and other U.S. Government agencies, as they had given and continued to give to client whistleblowers like Edward Snowden.

21.     Believing in and trusting the ACLU's and the other Defendants legal representation of him, Montgomery followed German's and the other individual Defendants', acting in concert, legal advice by sending the additional information and documentation.

22.     However, the Defendants subsequently neglected to actually help Montgomery with the ordinary standard of care required of lawyers.

23.     Because of the Defendants' failure to perform legal assistance for the Plaintiff to the professional standards of care required of attorneys, the Plaintiff lost legal rights.

24.     Because of the Defendants' failure to perform legal assistance for the Plaintiff to the professional standards required of attorneys, the Plaintiff also continued to lose money in his career, professional, occupation, and employment, his intellectual and other property rights, and continued to suffer harm and damage to his reputation.

25.     But then the Defendants suddenly began attacking and defaming Dennis Montgomery, starting in April 2015,[2] as part of their attacks on Sheriff Joe Arpaio ("Sheriff Arpaio") of Maricopa County, Arizona, his deputies, his office, and the Cold Case Posse of Maricopa County, alleging that these persons and entities engaged in an illegal criminal conspiracy with Dennis Montgomery.

---

[2]     The ACLU likely published attacks on Montgomery to journalists and others earlier. In late 2014, news articles began attacking Montgomery by citing unnamed sources.

26.     Defendants' intent was to destroy Sheriff Arpaio and Plaintiff as they were seen as adverse to Defendants' immigration agenda, which is based on having as many illegal aliens remain in the United States such that they can ultimately get voter cards and vote for leftist and Democrat political candidates, supportive of the Defendants' leftist agendas.

27.     In addition, the Defendants' attacks on Sheriff Arpaio, his office, deputies and the Cold Case Posse of Maricopa County, were calculated to raise huge donations for Defendants, as the leftwing and other supporters of the ACLU despise and oppose Sheriff Arpaio and all persons and entitles associated with him.

28.     The ACLU and the other Defendants, acting in concert, had and continue to have actual knowledge that their defamation and disparagement of Dennis Montgomery, later in 2015, is false, because Dennis Montgomery had also approached and consulted with the ACLU in 2013 to help protect him against those very same smears and defamation and help him repair the damage to his reputation as a whistleblower and to further his coming forward on behalf of the American people as a whistleblower.

29.     The Defendants ACLU, Cecillia Wang, Daniel Pochoda, Michael German, Andre Segura and Susan Herman, acting in concert, and their supporters, have become so motivated by their deep-seated hatred for and opposition to Sheriff Arpaio and his office, who they claim violated the civil rights of illegal immigrants, that they are willing to harm other clients, such as Plaintiff, and violate their lawyerly duties in their rush to damage Sheriff Arpaio, his office, his deputies and the Cold Case Posse of Maricopa County.

30.     Sheriff Arpaio actually enforces those laws that the ACLU is trying to overturn and therefore the ACLU is determined to make an example out of Sheriff Arpaio and those

persons and entities associated with him and to publicly destroy them, even if the ACLU and the other Defendants have to betray their own former clients to do so.

31.     Meanwhile, Plaintiff Montgomery had also been approached by Sheriff Arpaio and the Maricopa County Sheriff's Office ("MCSO") under MCSO's "Cold Case Posse" project concerning the same topics as his consultation with the ACLU, as it concerned Arizona citizens and illegal surveillance of them by the federal government.

32.     Introduced through Sheriff Arpaio and the MCSO "Cold Case Posse," the Plaintiff met with the Attorney General of Arizona seeking action on the same topics and concerns about which he had consulted with the ACLU and sought its legal assistance.

33.     However, now the Defendants have twisted, misrepresented and falsified facts concerning these events in public and in court pleadings in their hatred of and their determination to harm Sheriff Arpaio and those persons and entities associated with them.

34.     Importantly, and unlike the public at large, the ACLU and the other Defendants have actual knowledge of the truth about these matters, because the Plaintiff confidentially disclosed in a private attorney client communications the truth about highly sensitive information regarding the U.S. Government's actions, to the ACLU and the other Defendants.

35.     Daniel Pochoda, acting in concert with the other Defendants, while speaking for the ACLU specifically in relation to M*elendres v. Arpaio*, *supra*, and specifically in attacking Sheriff Arpaio, defamed Dennis Montgomery in a <u>New York Times</u> article June 15, 2015, written by Ms. Fernanda Santos, Phoenix, Arizona, Bureau Chief, titled "Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff."

> "***This guy [Sheriff Arpaio] hired a person [Dennis Montgomery] previously found to be a con man***," said Dan Pochoda, senior counsel for the American Civil Liberties Union of Arizona, which represents the plaintiffs in the case against Sheriff Arpaio.

(Emphasis added.)

36.     The Defendants' defamation, disparagement and  smears of the Plaintiff are far more damaging than mere news reporting because of the public impression and public image of the legal expertise, fame, reputation, and perceived credibility of the ACLU proclaiming that the Plaintiff has been previously been found to be a con man and a criminal.

37.     The factual assertion that **Dennis Montgomery is "*a con man**,"* and that he has been previously found to be a con man, is defamation *per se.*

38.     The underlying bases of these allegations are services Plaintiff provided to the U.S. Government.

39.     Therefore, the Defendants' statement is not only a false representation of criminal conduct, but also constitutes the making of false statements to the U.S. Government which is a crime under 18 U.S.C. § 1001 and also constitutes the violation of the False Claims Act 31 U.S.C. §§ 3729 – 3733 by submitting an alleged claim for payment based upon fraud or misrepresentation, which is also a crime.

40.     The Defendants' statements are defamation *per se* on at least two grounds, claiming commission of a criminal act and dishonesty in one's trade or business.

41.     The original version of the article was mass-distributed in physical form in an estimated 1.3 to 1.8 million newspapers physically distributed in Florida, nationally and internationally on June 15, 2015, on the Internet, in Florida and elsewhere. *See* Exhibit A.

42.     The article was revised on June 16, 2015, but the Defendants' defamation is identical in both versions and was also published in print form and on the Internet in Florida, nationally, internationally, and elsewhere.  *See* Exhibit B.

43.     Daniel Pochoda and Cecillia Wang, and the other individual Defendants acting in concert with each other, thus attacked their own former client Dennis Montgomery in public and in court pleadings, and thereby violated their ethical and fiduciary responsibilities of loyalty and confidentiality.

44.     The Defendants, acting in concert, have actual knowledge that Dennis Montgomery cannot fully defend himself against this defamation and these public disparagement and smears because of legal restrictions on what he can disclose under the national security laws of the United States.  Therefore, the ACLU feels free to lie about Montgomery and his work with Sheriff Arpaio and the persons and entities associated with Sheriff Arpaio, taking advantage of Montgomery's precarious situation.

45.     Indeed, Dennis Montgomery sought to intervene in the *Melendres* litigation to stop the repetition of this same defamation, disparagement and smears and to protect his intellectual and other property interests, which Defendants, in concert, compromised and damaged in their advocacy against Plaintiff in this case in particular.

46.     Incredibly, and without legal bases, the Defendants unethically and illegally opposed Montgomery's efforts to intervene, including by smearing his chosen current attorneys as much as they smear Montgomery, in opposition to the goals of their former client on behalf of their current clients the *Melendres* Plaintiffs.

47.     On information and belief, Cecillia Wang, Daniel Pochoda, the ACLU and the other ACLU individual Defendants, acting in concert with each other, distributed the same or similar defamatory and derogatory statements to other journalists and news organizations, not only to The New York Times.

48.     Furthermore, apparently starting in April 2015, Defendants representing Plaintiff and acting under the authority of the ACLU, including but not limited to Cecillia Wang, Daniel Pochoda, Andre I. Segura, Michael German, Joshua Bendor and Susan Herman, acting in concert with each other, have repeatedly (as a course of conduct) threatened, incited, and sought to stir up criminal prosecution of Dennis Montgomery along with their main targets Sheriff Joe Arpaio, Chief Deputy Jerry Sheridan and other personnel of the Maricopa County Sheriff's Office ("MCSO") as well as the Maricopa County Cold Case Posse.

49.     Threatening criminal prosecution to gain advantage in civil litigation is prohibited by the ethical obligations of the legal profession.  Seeking to orchestrate and incite criminal prosecution of a former client is a violation of the fiduciary and other duties of loyalty and confidentiality owed to a client.

50.     In Footnote 2 on Page 9, of the Defendants' pleading **Response in Opposition to Sheriff Arpaio and Chief Deputy Sheridan's Motion for Recusal or Disqualification of the Court** filed by the ACLU in *Melendres v. Arpaio* in the U.S. District Court for the District of Arizona, Civil Action No. CV-07-2513-PHX-GMS, attached as Exhibit C, the ACLU, acting in concert with the individual Defendants, accused Dennis Montgomery of committing crimes.

> Even more troubling, as the Court noted in a post-hearing status conference, the evidence indicates that Dennis Montgomery informed MCSO personnel—with Chief Deputy Sheridan's knowledge—that he was using a database of information "harvested by the CIA and confiscated by him" in his investigation, and also purported to be tracking telephone calls between the Court, the Attorney General, the Assistant Attorney General, and the U.S. Attorney for the District of Arizona. Tr. of May 14, 2015 at 44:22-45:2, 45:10-16; Wang Decl., Ex. C, F. ***This implicates possible violations of federal criminal laws by MCSO personnel in the course of the MCSO-Montgomery investigation.*** See, e.g., 18 U.S.C. §§ 793(b)-(f) (taking or communication of documents relating to national defense); 798 (disclosure of classified information); 1503 (intimidation of federal court and

obstruction of justice); 1509 (obstruction of court orders); 1924 (unauthorized removal of classified information); 2511 (intercepting electronic communications); 2701 (unlawful access to stored communications).

*(Emphasis added.)*

51.     As shown in the entire course of events and public statements involving the lawsuit, Ms. Wang and Mr. Pochoda and the other ACLU attorneys and other Defendants, acting in concert with each other, make these allegations with the intention to cause criminal prosecution to be initiated against the Plaintiff Dennis Montgomery (as part of their efforts to incite criminal prosecution of Sheriff Arpaio, his office, deputies and the Cold Case Posse of Maricopa County).

52.     The Defendants also attacked Dennis Montgomery in other legal pleadings in the case of *Melendres v. Arpaio*, also in violation of the fiduciary and other duties of loyalty and confidentiality to a client.

53.     The ACLU and the other individual Defendants, acting in concert with each other, have turned on its own former client and intensified and spread the damage caused by the defamation, disparagement, false and misleading information and smears against this whistleblower.

54.     Prior to filing suit, the Plaintiff, by the undersigned counsel, sent letters to the ACLU and all of the Defendants at the ACLU demanding retraction of the defamation pursuant to § 770.02 Florida Statutes (2012) "Notice condition precedent to action or prosecution for libel or slander, " as well as their withdrawal as counsel for the Plaintiffs in the *Melendres* litigation, given their professional misconduct and conflicts of interest.

55.     The Plaintiff incorporates by reference that demand letter sent to the ACLU and the other Defendants, which is attached as Exhibit D.

56.     In response to this demand letter under Florida Statutes § 770.02, the ACLU by Ms. Cecillia Wang, acting in concert with the other Defendants, responded with a dishonest rebuke, making it clear that she, the ACLU and the other Defendants, acting in concert, have no intention of stopping its attacks on and harm to Dennis Montgomery or withdrawing as counsel for the Plaintiffs in the *Melendres* case even in the face of their clear-cut professional misconduct and conflicts of interest.  *See* Exhibit E, attached.

57.     As a result, the harm is continuing and the Defendants, each and every one of them, acting in concert and jointly and severally, have refused to correct or stop their severe injury and damage to the Plaintiff, which damage is being compounded daily.

58.     Also, the Plaintiff alleges that the ACLU and the other individual Defendants acting in concert with each other, actually used some of the information the Plaintiff provided confidentially to them as a basis for the ACLU's lawsuit *Melendres v. Arpaio* and perhaps other cases. Defendants acting in concert therefore used confidential and other information he gathered and provided by the Plaintiff.

59.     Plaintiff Montgomery is not a public figure.

60.     Plaintiff Montgomery is a private citizen and at all material times acted individually and in business in these capacities.

61.     Nevertheless, Defendants' actions establish actual malice because the ACLU and the other individual Defendants, acting in concert with each other, have – intentionally and knowingly – harmed and are harming Dennis Montgomery for the purpose of advancing the ACLU's goals to further illegal immigration, and other related goals, as this suits its political interests by giving illegal immigrants voting and other rights to elect leftist candidates aligned with the Democratic Party and its other clients in the *Melendres* case and elsewhere.

62.     The Defendants' harm to Dennis Montgomery is not negligent or accidental but an intentional part of its campaign to harm its main target, Sheriff Arpaio, his office, his deputies, and the Cold Case Posse of Maricopa Country while illegally trampling upon and destroying Plaintiff Dennis Montgomery in the process.

IV.     **CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
*Breach of Fiduciary Duty*

63.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

64.     Florida has identified the elements for a breach of fiduciary duty specifically when involving an attorney's breach against a client:

> "As for a claim of breach of fiduciary duty, a plaintiff must allege three elements: the existence of a fiduciary duty, a breach of that duty, and plaintiff's damages proximately caused by the breach. *Gracey v. Eaker*, 837 So.2d 348, 353 (Fla.2002)." *Rocco v. Glenn, Rasmussen, Fogarty & Hooker, P.A.*, 32 So.3d at 116 n. 2.

*Moscowitz v. Oldham*, 48 So.3d 136 (Fla. App., 2010)

65.     Dennis Montgomery sought the legal assistance of the ACLU and the other Defendants with the legal issues he faces, including stopping prior defamation of him to silence and discredit him as a whistleblower attempting to reveal illegal and unconstitutional conduct by the U.S. Government, disclosing the information about misconduct as a whistleblower in a way to bring about change pursuant to the law, and repairing the damage to his reputation from the defamation and smears brought to silence and discredit him, as well as protecting his intellectual and other property rights, as well as other rights.

66.     When the Plaintiff sought the legal assistance of the ACLU and the other individual Defendants as not only professional experts as attorneys and otherwise but as experts

recognized worldwide as specialists in these areas, a fiduciary duty of trust owed by the ACLU and the other Defendants to the Plaintiff was created.

67.     Instead of assisting the Plaintiff with those legal concerns, the Defendants, acting in concert with each other, have turned around and attacked him publicly, further harming Plaintiff's reputation and trade and profession, as well as damaging his intellectual and other property rights, and other rights, including by stating to <u>The New York Times</u> on or about June 15, 2015, via Fernando Santos, as well as in court in the *Melendres* case:

> "***This guy [Sheriff Arpaio] hired a person [Dennis Montgomery] previously found to be a con man***," said Dan Pochoda, senior counsel for the American Civil Liberties Union of Arizona, which represents the plaintiffs in the case against Sheriff Arpaio.

(Emphasis added.)

68.     As a direct conflict of interest between the Plaintiff and the *Melendres* Plaintiffs, Defendants, acting in concert with each other, have harmed the Plaintiff in order to advance the interests of the *Melendres* Plaintiffs who favor illegal immigration and have set out to destroy Sheriff Arpaio, his deputies, and others who seek to enforce the laws of Arizona against them. The Plaintiff and *Melendres* Plaintiffs are adverse in an actual conflict of interest.

69.     The conflict of interest of the Defendants between the Plaintiff and the *Melendres* Plaintiffs accelerated into an increased conflict when the Defendants, acting in concert, and the presiding Judge Snow injected Dennis Montgomery into the *Melendres v. Arpaio* case apparently only in April 2015 and started to defame and attack him in court and publicly, as well as damage his intellectual and other property interests and other rights.

70.     The Defendants, acting in concert, have also sought to induce criminal prosecution against him, thereby not only failing entirely to fulfill its fiduciary duty but directly opposing the goals for which the Plaintiff sought the ACLU's and the other individual

Defendants' legal assistance in an established attorney-client and professional relationship. *See* Exhibit C, attached.

71.     Furthermore, the Defendants failed to act diligently, promptly, or effectively for the Plaintiff, contrary to the standard of care owed by Plaintiff as a client, and thereby allowed rights to be compromised, opportunities for solutions to pass, and continued defamation against the Plaintiff to proliferate, as well as harm his intellectual and other property rights and other rights.

72.     While the Plaintiff sought the ACLU's and the other individual Defendants assistance to further his interests and those of the nation, as early as 2013, as a result of the Defendants actions and inactions, instead the Plaintiff has remained unemployable and destitute, leading to the foreclosure of his house, and the cumulative effect upon his finances, profession, career, employment, and occupation of these smears has grown worse both in direct damage but also in the steadily increasing difficulty of now trying to rebut the lies told against him, and other actionable acts as plead herein against the Defendants.

73.     Plaintiff has also been caused severe emotional distress, and given his fragile health that the ACLU and the other Defendants knew about at the time Plaintiff Montgomery first contacted the ACLU, has been placed in a condition of immediate bodily injury, incapacitation and potential death.

### SECOND CAUSE OF ACTION
*Professional Malpractice*

74.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

75.     For a legal malpractice claim, Florida recognizes that the cause of action:

"has three elements: (1) the attorney's employment, (2) the attorney's neglect of a reasonable duty, and (3) the attorney's negligence [as] the proximate cause of the client's loss." Cira v. Dillinger, 903 So.2d 367 (Fla. 2d DCA 2005).

*Rocco v. Glenn, Rasmussen, Fogarty & Hooker, P.A.*, 32 So.3d 111, 116 (Fla. 2d DCA 2009) (cited and relied upon in *Moscowitz v. Oldham*, 48 So.3d 136 (Fla. App., 2010)).

76.     As pled in detail above and throughout this Complaint, the Plaintiff sought out the ACLU's and the other individual Defendants' assistance with several related legal matters and circumstances, and Mike German, acting in concert with the other Defendants, provided legal advice including demanding documents to be used in the ACLU's future legal activities defending and assisting Dennis Montgomery.

77.     As pled above, the ACLU and the other individual Defendants, acting in concert with each other, violated the standard of care required of licensed attorneys, and failed to follow through and assist the Plaintiff as required of attorneys and other related persons as the ACLU.

78.     Instead the Defendants then turned around and attacked the Plaintiff for the benefit of the ACLU's other political goals and the *Melendres* Plaintiffs as well as the ACLU's and other supporters.

79.     The Defendants have actively opposed the Plaintiff's interests and defamed and harmed him as a result of an actual conflict of interest between the Plaintiff and the *Melendres* Plaintiffs, as well as other professional misconduct as pled herein.

80.     That conflict of interest was heightened when the Defendants and Judge Snow injected Dennis Montgomery into that lawsuit, without cause or rationale other than to harm him and Sheriff Arpaio, his office, his deputies,  and the Cold Care Posse of Maricopa County apparently as late as April 2015.

81.     The Defendant ACLU and the other individual Defendants, acting in concert with each other, failed to act diligently, promptly, or effectively for the Plaintiff and thereby allowed Plaintiff's rights to be lost, opportunities for solutions to pass, and continued defamation and loss of intellectual and other property rights against the Plaintiff to proliferate and be compounded.

82.     In violation of the duty of loyalty and confidentiality, the Defendants have spread defamation, disparagement and smears about the Plaintiff and have also worked aggressively to block the Plaintiff's attempts to rebut the lies and smears being spread against him, as well as to protect his intellectual and other property, advancing the goals of the *Melendres* Plaintiffs and their own at the expense of the Plaintiff Dennis Montgomery, including publishing to The New York Times on or about June 15, 2015, via Fernanda Santos:

> "***This guy [Sheriff Arpaio] hired a person [Dennis Montgomery] previously found to be a con man***," said Dan Pochoda, senior counsel for the American Civil Liberties Union of Arizona, which represents the plaintiffs in the case against Sheriff Arpaio.

(Emphasis added.)

83.     While the Plaintiff sought the ACLU's and the other individual Defendants' legal assistance to further his and the nation's interests as early as 2013, instead, due to the Defendants' actions and inactions, the Plaintiff has remained unemployable and destitute, leading to the foreclosure of his house, and the cumulative effect upon his finances, profession, career, employment, and occupation of this defamation, disparagement and smears have grown worse both in direct damage but also in the steadily increasing difficulty of now trying to rebut the lies told against him, as well as Defendants" other professional misconduct.

### THIRD CAUSE OF ACTION
*Common Law Defamation "Per Se"*

84.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

85.     Defendants have also severely harmed Plaintiff's intellectual and rights property interests as well as other interests in the *Melendres* case, as set forth herein in this Complaint.

86.     As pled above in detail, the Defendants – acting on behalf of the ACLU and for the ACLU's clients, supporters and goals – publicly defamed the Plaintiff as having been previously found  to be a "con man," including publishing to The New York Times on or about June 15, 2015, via The New York Times reporter Fernanda Santos, which was published in Florida, nationwide and internationally as a physical newspaper and also published on The New York Times' website on the internet:

> "***This guy [Sheriff Arpaio] hired a person [Dennis Montgomery] previously found to be a con man***," said Dan Pochoda, senior counsel for the American Civil Liberties Union of Arizona, which represents the plaintiffs in the case against Sheriff Arpaio.

(Emphasis added.)

87.     The underlying basis of this continuing course of misconduct and illegality makes it explicitly clear and overwhelmingly obvious that this false and misleading statement is about Dennis Montgomery.  Not only does the description of who is being referred to apply to Dennis Montgomery and only Dennis Montgomery, but also he surrounding passages explicitly name Dennis Montgomery explicitly in reference to his connection to Sheriff Arpaio.

88.     Defendants' defamation of Plaintiff Montgomery was made and undertaken negligently and/or with actual malice.

89.     Defendants had knowledge of the falsity of the defamatory statements, or made the defamatory statements with reckless disregard for the truth.

90.     Defendants falsely accused Plaintiff of fraud, crime, scams, and being previously found to be a con artist.

91.     A statement is per se defamatory if it falsely imputes to another conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession or office; in other words, or if it tended to injure Plaintiff in his trade or profession.

92.     A statement is also per se defamatory if "it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office, or (d) the other being a woman, acts of unchastity." *Campbell v. Jacksonville Kennel Club, Inc*., 66 So. 2d 495, 497 (Fla. 1953) citing Restatement, Torts, Section 570.

93.     For Defamation Per Se, actual malice need not be shown because damages are presumed. *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497 (Fla. 1953); *Wolfson v. Kirk*, 273 So. 2d 774 (Fla. Dist. Ct. App. 4th Dist. 1973).

94.     Statements are "*defamatory per se,*" recognized under Florida law when statements are so powerful in their ability to hurt someone that Florida law presumes harmful as a matter of law. *Montgomery v. Knox,* 23 Fla. 595, 3 So. 211, 217 (1887), such that a court will allow damages to be awarded in these cases even if no evidence of harm has been presented. "[T]he law presumes malice in their utterance," *Abraham v. Baldwin*, 52 Fla. 151, 42 So. 591, 592 (1906), where the words are "… of such common notoriety established by the general consent of men, that the courts must of necessity take judicial notice of its harmful effect." *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 236 (1933).

## FOURTH CAUSE OF ACTION
### *Common Law General Defamation*

95.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

96.     To establish General Defamation, a plaintiff need only show: (1) publication; (2) falsity; (3) that the defendant acted with knowledge or reckless disregard as to the falsity on a matter concerning a public figure; (4) actual damages; and (5) the statement must be defamatory.

97.     Pleading cumulatively in the alternative to the Third Cause of Action, Plaintiff re-alleges the allegations under the Third Cause of Action but also alleges that each of those statements also qualify under the cumulative and alternative legal grounds of General Defamation under Florida law.

## FIFTH CAUSE OF ACTION
### *Common Law Defamation By Implication*

98.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

99.     For Defamation by Implication: " . . . [L]iterally true statements can be defamatory where they create a false impression. This variation is known as Defamation by Implication and has a longstanding history in defamation law." *See Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008). Defamation by Implication occurs when a publication states facts that are literally true, but produces a defamatory meaning apparent from a plain reading of the publication in its entirety. *See Chapin v. Knight-Ridder, Inc.* 993 F.3d 1087 (4th Cir. 1993).

100.     Pleading cumulatively in the alternative to the Third Cause of Action, Plaintiff re-alleges the allegations under the Third Cause of Action but also alleges that each of those statements also qualify under the alternative and cumulative legal grounds of Defamation by Implication under Florida law.

## SIXTH CAUSE OF ACTION
### *Common Law Intentional Infliction of Emotional Distress*

101.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

102.    The Defendants have actual knowledge that the Plaintiff is legally handicapped and medically ill, and knew this as a result of their communications with the Plaintiff in 2014, and have also learned of this repeatedly in April, May, and June of 2015.

103.    The Plaintiff suffered a brain aneurysm and a related multi-infarct stroke on May 12, 2014.  He suffered both a hemorrhagic stroke (caused by ruptured blood vessels that cause brain bleeding) and an ischemic stroke (loss of blood flow).  He was in the hospital for two months, through June 2014.  He has been left permanently disabled and partially paralyzed. Plaintiff could suffer a similar or repeated event causing him to die at any time.

104.    The Defendants knew about this – because the Plaintiff raised it repeatedly in his attempts to intervene in *Melendres v. Arpaio*, *supra* – before making and thus publishing the defamatory statements on or about June 15, 2015, to The New York Times and (on information and belief) to others.

105.    Defendants' knowing and intentional publication of the defamatory, disparaging and other harmful statements against the Plaintiff has foreseeably and proximately caused the Plaintiff emotional distress and thus personal injury.

106.    Under the law intention does not require the intention to cause a particular result but only that a defendant intended to take the action that causes the harm.

107.    Here, the Defendants acted intentionally to cause harm to Dennis Montgomery from which emotional distress was an overwhelmingly obvious and foreseeable result.

108.    Here, the Defendants acted with actual malice in wanting to harm Sheriff Arpaio by portraying Dennis Montgomery as previously found to be a con man engaged in a criminal conspiracy with Sheriff Arpaio, his office, his deputies, and the Cold Case Posse of Maricopa County as well as harming his property interests and other rights.

109.    Defendants' intentional actions were committed with the knowledge that they would cause extreme physical pain and suffering and cause severe emotional distress to the Plaintiff, including incapacitation and possible death.

110.    Defendants' actions, each and every one of them, jointly and severely, were willful malicious, deliberate, and were done with reckless or negligent indifference to the likelihood that such behavior would cause severe emotional distress, and thus personal injury, and with utter disregard for the consequences of such actions. They were intended to harm Sheriff Arpaio, his office and his deputies, and members of the Cold Case Posse in Maricopa County, by harming and destroying Plaintiff.

## **PRAYER FOR RELIEF**

With regard to all counts, Plaintiff demands that judgment be entered against Defendants, each and every one of them, acting in concert, jointly and severally, for compensatory and actual damages in excess $20 million U.S. Dollars as a direct and proximate result of the intentional, willful, malicious or negligent actions of Defendants causing financial, reputational, emotional, physical and professional injury to Plaintiff, damage to his intellectual and other property rights, as well as for equitable relief as may be appropriate, reasonable attorneys fees, and such other relief the Court may deem just and proper.  Plaintiff further prays for an award of punitive damages in excess of $90 million U.S. Dollars to punish the Defendants for their outrageous and malicious conduct.

## <u>JURY DEMAND</u>

**Plaintiff respectfully demands a jury trial on all issues so triable.**

Dated: June 30, 2015

Respectfully submitted,

*/s/ Larry Klayman*
Larry Klayman, Esq.
FL Bar No. 246220
7050 W Palmetto Park Rd.
Suite 15-287
Boca Raton, FL 33433
(310) 595-0800
leklayman@gmail.com
Attorney for Plaintiff

Exhibit A

# The New York Times




Twists Outnumber Judges
(So Far) in Case Against
Arizona Sheriff



CHICAGO JOURNAL
Blackhawks Fans Show
That Chicago Can Love a
Winner, Too



Losing Custody of Son
Appeared to Set Off
Troubled Dallas Gunman
Family Says

U.S.

# Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff

By FERNANDA SANTOS   JUNE 15, 2015



Sheriff Joe Arpaio after an event on Tuesday celebrating his tenure as the longest-serving sheriff in the history of Maricopa County in Arizona. Laura Segall for The New York Times

Email

Share

PHOENIX — Judge G. Murray Snow pressed Sheriff Joe Arpaio to answer a bit of an odd question: Was the sheriff investigating the judge and his wife?

Judge Snow had already ruled against Sheriff Arpaio in a civil rights

Tweet

Save

More

mistress
america
august 14

case brought by Latinos who said they had been singled out because of their ethnicity, and the sheriff was back in Federal District Court here after admitting that he had violated an order barring his deputies from singling out Latinos they suspected of being in the country illegally.

But the issue at hand in late April involved whether Sheriff Arpaio and the Maricopa County sheriff's office had hired a rogue informant in Seattle — a compulsive gambler known for scamming federal agencies — to investigate whether Judge Snow and the Department of Justice were working together to take the sheriff down.

Sheriff Arpaio testified that, yes, he had hired the informant. And that was only the half of it: Sheriff Arpaio also said he had employed a private agent to investigate Judge Snow's wife after the sheriff received an email from someone claiming to have overheard her mention her husband's negative views of the sheriff.

**RELATED COVERAGE**



**Sheriff Joe Arpaio Embraces His Hollywood Moment**  APRIL 25, 2014

**Federal Judge Finds Violations of Rights by Sheriff Joe Arpaio**  MAY 24, 2013



**Angry Judge Says Sheriff Defied Order on Latinos**  MARCH 24, 2014

Both investigations led nowhere. But now, after Judge Snow asked pointed questions about the dual inquiries — describing them as an effort "to construct some bogus explanation to subvert this court" — Sheriff Arpaio's lawyers are using the judge's line of questioning to try to get the case reassigned. Arguing in court documents that Judge Snow raised the specter of judicial bias and impropriety when he asked questions pertaining to personal matters in court, they are demanding someone new.

"This is not about vitriolic accusations against the judge — he's a decent guy, a good judge," A. Melvin McDonald, a criminal lawyer retained by Sheriff Arpaio, said in an interview. "It's about the personal animus he has displayed to the claim."

It is also a sign of how Sheriff Arpaio has operated through much of his 22 years as sheriff, using his office and power to sidestep pressure to change his approach to policing, an issue that is part of the Justice Department's lawsuit, filed in 2012. He had previously begun other investigations against critics and opponents, drumming up claims of corruption and other malfeasance against state judges, elected officials

and the publishers of an alternative weekly, Phoenix New Times.

All of the cases eventually fell apart: Many of the accused successfully sued the sheriff's office, earning millions of dollars in damages, paid with taxpayers' money.

Judge Snow now has to decide whether to remain on Sheriff Arpaio's case or to let another federal judge take his place.

Regardless, Sheriff Arpaio has more legal troubles on the way: On Thursday, Judge Roslyn O. Silver, who is overseeing a civil rights lawsuit by the Justice Department against the sheriff and his office, ordered a bench trial to start Aug. 10.

An appointee of President George W. Bush, Judge Snow has played referee and arbiter in the seven-year-old civil rights case against Sheriff Arpaio since Judge Mary Murguía recused herself in 2009. Judge Murguía's recusal followed complaints from the sheriff about an appearance of conflict, given that her twin sister, Janet, was president and chief executive of the National Council of La Raza, one of the country's largest Latino advocacy groups.

Judge Snow ruled against Sheriff Arpaio in May 2013, delivering what appeared to be a decisive blow against the six-term sheriff, then 80, a defining symbol of Arizona's strict approach to immigration enforcement.

But 10 months later, Sheriff Arpaio was back before him, facing stern reproach for defying his order to stop singling out Latinos during patrols and traffic stops.

He told Sheriff Arpaio in April that he was looking for "a pattern that reflects a hesitancy on the sheriff's office, on the sheriff's department and on your part, or even a desire to subvert the orders of this court."

One of the issues involved the failure by Sheriff Arpaio and his chief deputy, Jerry Sheridan, to properly disseminate the judge's instructions to officers. Before the hearing, they admitted to this and other failings and pledged again to stick to the judge's corrective measures.

But the hearing went on as planned.

In court in April, Judge Snow noted that the Maricopa County sheriff's office, also known as M.C.S.O., was only 29 percent in compliance with the changes he had ordered 18 months earlier, right around the time

the informant, Dennis Montgomery, started his investigation.

Judge Snow said he was troubled — by both the investigation and what it had produced.

"The court wonders why, when the M.C.S.O. should have been spending their time, money and resources in implementing its order, they were funding a confidential informant as well as three M.C.S.O. deputies or posse members to be in Seattle, Wash., accruing overtime, travel and salary expenses, as well as significant technology costs, attempting to construct some bogus conspiracy theory to discredit this court," Judge Snow said in court.

He took to referring to the investigation as the "Seattle Operation" and sounded skeptical when describing the reasoning and results of Mr. Montgomery's work. He said Mr. Montgomery had "allegedly" used information "harvested by the C.I.A. and confiscated by him" when he was a government software contractor.

The materials, the judge said, included fragments of email messages between the Justice Department and a former clerk of Judge Snow's, as well as snippets of phone calls Mr. Montgomery claimed to have tracked between Judge Snow and the former attorney general, Eric H. Holder Jr., as well as with other high-ranking Justice Department officials.

On the stand, Deputy Sheridan said Mr. Montgomery had "pulled data from American citizens for the C.I.A.," an assertion that the agency has denied.

When Judge Snow suggested that the materials provided by Mr. Montgomery were "junk," Deputy Sheridan and Sheriff Arpaio agreed.

But the tale of the conspiracy has nonetheless reverberated from the glass-and-steel Sandra Day O'Connor United States Courthouse here to the halls of the Justice Department and the Pentagon. Last month, Judge Snow asked Michele M. Iafrate, who is representing Mr. Arpaio in the civil contempt case, to write to the C.I.A., informing it that her client may be in possession of some of its materials.

The cache is also said to include bank account numbers and balances for about 50,000 residents of Maricopa County, Deputy Sheridan told Judge Snow.

Mr. Montgomery, however, could just be bluffing: His reputation,

easily uncovered with a cursory search, includes ample evidence of deception. He duped the federal government more than once, according to federal officials, selling it antiterrorism technology that proved to be a hoax.

In 2007, he falsely accused the governor of Nevada at the time, Jim Gibbons, of having received kickbacks from Mr. Montgomery's former employer to help it secure secret federal defense contracts. Two years later, Mr. Montgomery was arrested on charges that he had written $1 million in bad checks at a Las Vegas casino. He filed for personal bankruptcy that year, over mounting gambling debts.

"This guy hired a person previously found to be a con man," said Dan Pochoda, senior counsel for the American Civil Liberties Union of Arizona, which represents the plaintiffs in the case against Sheriff Arpaio.

The sheriff's office certified Mr. Montgomery as a confidential informant. On the stand, Sheriff Arpaio said he did not recall how much money Mr. Montgomery had gotten for his work.

Stephen Lemons, the Phoenix New Times columnist who first reported the link between Mr. Montgomery and Sheriff Arpaio, said he had relied on information from "longtime sources," including a former detective in the sheriff's Special Investigations Division, the unit that had been handling Mr. Montgomery.

On Jan. 21, Mr. Lemons wrote about the investigation into Judge Snow's wife. It started, the article said, after a sympathizer wrote a private Facebook message to Sheriff Arpaio, telling him that the judge's wife, an old acquaintance, had mentioned during a casual encounter at a Mexican restaurant that the judge was out to get him.

Larry Klayman, Mr. Montgomery's lawyer, a well-known defender of conservative causes, has mostly taken aim at Mr. Lemons, calling him a "sleazy reporter" working for a "discredited, ultraleftist and pro-illegal immigrant" publication.

But when questioned by Judge Snow in court, Sheriff Arpaio and Deputy Sheridan confirmed what the judge had highlighted: The investigations described in Mr. Lemons's reporting were real.

**MOST EMAILED**

**1.** A Shifting Middle: America's Seniors Find Middle-Class 'Sweet Spot' 

**2.** Opinion: How to Make Online Dating Work 

**3.** The Upshot: To Lose Weight, Eating Less Is Far More Important Than... 

**4.** Opinion: Three Simple Rules for Eating Seafood 

**5.** Magna Carta, Still Posing a Challenge at 800 

**6.** In Tucson, an Unsung Architectural Oasis 

**7.** Op-Ed Contributor: Stop Revering Magna Carta 

**8.** Paul Krugman: Democrats Being Democrats 

**9.** Pope Francis to Explore Climate's Effect on World's Poor 

**10.** Nature Helps Squeeze Out a Little More Mileage

View Complete List »

AMERICAN EXPRESS
PERSONAL SAVINGS

The New York Times

**NEWS**

World

U.S.

Politics

New York

Business

Technology

Science

Health

Sports

Education

Obituaries

Today's Paper

Corrections

**OPINION**

Today's Opinion

Op-Ed Columnists

Editorials

Contributing Writers

Op-Ed Contributors

Opinionator

Letters

Sunday Review

Taking Note

Room for Debate

Public Editor

Video: Opinion

**ARTS**

Today's Arts

Art & Design

ArtsBeat

Books

Dance

Movies

Music

N.Y.C. Events Guide

Television

Theater

Video Games

Video: Arts

**LIVING**

Automobiles

Crossword

Food

Education

Fashion & Style

Health

Home & Garden

Jobs

Magazine

N.Y.C. Events Guide

Real Estate

T Magazine

Travel

Weddings & Celebrations

**LISTINGS & MORE**

Classifieds

Tools & Services

Times Topics

Public Editor

N.Y.C. Events Guide

TV Listings

Blogs

Cartoons

Multimedia

Photography

Video

NYT Store

Times Journeys

Subscribe

Manage My Account

**SUBSCRIBE**

Times Premier

Home Delivery

Digital Subscriptions

NYT Opinion

Crossword

Email Newsletters

Alerts

Gift Subscriptions

Corporate Subscriptions

Education Rate

Mobile Applications

Replica Edition

International New York Times

© 2015 The New York Times Company | Privacy | Terms of Service

Site Map | Help | Site Feedback

Exhibit B

# The New York Times




**U.S.**

# *Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff*

By **FERNANDA SANTOS**    JUNE 15, 2015



Sheriff Joe Arpaio after an event on Tuesday celebrating his tenure as the longest-serving sheriff in the history of Maricopa County in Arizona. Laura Segall for The New York Times

Email

Share

PHOENIX — Judge G. Murray Snow pressed Sheriff [Joe Arpaio](#) to answer a bit of an odd question: Was the sheriff investigating the judge and his wife?



Tweet

Save

More


mistress america
august 14

Judge Snow had already ruled against Sheriff Arpaio in a civil rights case brought by Latinos who said they had been singled out because of their ethnicity, and the sheriff was back in Federal District Court here after admitting that he had violated an order barring his deputies from singling out Latinos they suspected of being in the country illegally.

But the issue at hand in late April involved whether Sheriff Arpaio and the Maricopa County sheriff's office had hired a rogue informant in Seattle — a compulsive gambler who federal officials came to believe had sold them bogus antiterrorist technology — to investigate whether Judge Snow and the Department of Justice were working together to take the sheriff down.

Sheriff Arpaio testified that, yes, he had hired the informant. And that was only the half of it: Sheriff Arpaio also said he had employed a private agent to investigate Judge Snow's wife after the sheriff received an email from someone claiming to have overheard her mention her husband's negative views of the sheriff.

Both investigations led nowhere. But now, after Judge Snow asked pointed questions about the dual inquiries — describing them as an effort "to construct some bogus explanation to subvert this court" — Sheriff Arpaio's lawyers are using the judge's line of questioning to try to get the case reassigned. Arguing in court documents that Judge Snow raised the specter of judicial bias and impropriety when he asked questions



RELATED COVERAGE


Sheriff Joe Arpaio Embraces His Hollywood Moment    APRIL 25, 2014

Federal Judge Finds Violations of Rights by Sheriff Joe Arpaio    MAY 24, 2013


Angry Judge Says Sheriff Defied Order on Latinos    MARCH 24, 2014

pertaining to personal matters in court, they are demanding someone new.

"This is not about vitriolic accusations against the judge — he's a decent guy, a good judge," A. Melvin McDonald, a criminal lawyer retained by Sheriff Arpaio, said in an interview. "It's about the personal animus he has displayed to the claim."

It is also a sign of how Sheriff Arpaio has operated through much of his 22 years as sheriff, using his office and power to sidestep pressure to change his approach to policing, an issue that is part of the Justice Department's lawsuit, filed in 2012. He had previously begun other investigations against critics and opponents, drumming up claims of corruption and other malfeasance against state judges, elected officials and the publishers of an alternative weekly, Phoenix New Times.

All of the cases eventually fell apart: Many of the accused successfully sued the sheriff's office, earning millions of dollars in damages, paid with taxpayers' money.

Judge Snow now has to decide whether to remain on Sheriff Arpaio's case or to let another federal judge take his place.

Regardless, Sheriff Arpaio has more legal troubles on the way: On Thursday, Judge Roslyn O. Silver, who is overseeing a civil rights lawsuit by the Justice Department against the sheriff and his office, ordered a bench trial to start Aug. 10.

An appointee of President George W. Bush, Judge Snow has played referee and arbiter in the seven-year-old civil rights case against Sheriff Arpaio since Judge Mary Murguía recused herself in 2009. Judge Murguía's recusal followed complaints from the sheriff about an appearance of conflict, given that her twin sister, Janet, was president and chief executive of the National Council of La Raza, one of the country's largest Latino advocacy groups.

Judge Snow ruled against Sheriff Arpaio in May 2013, delivering what appeared to be a decisive blow against the six-term sheriff, then 80, a defining symbol of Arizona's strict approach to immigration enforcement.



But 10 months later, Sheriff Arpaio was back before him, facing stern reproach for defying his order to stop singling out Latinos during patrols and traffic stops.

He told Sheriff Arpaio in April that he was looking for "a pattern that reflects a hesitancy on the sheriff's office, on the sheriff's department and on your part, or even a desire to subvert the orders of this court."

One of the issues involved the failure by Sheriff Arpaio and his chief deputy, Jerry Sheridan, to properly disseminate the judge's instructions to officers. Before the hearing, they admitted to this and other failings and pledged again to stick to the judge's corrective measures.

But the hearing went on as planned.

In court in April, Judge Snow said that the Maricopa County sheriff's office was only 29 percent in compliance with the changes he had ordered 18 months earlier, right around the time the informant, Dennis Montgomery, started his investigation.

Judge Snow said he was troubled — by both the investigation and what it had produced.

"The court wonders why, when the M.C.S.O. should have been spending their time, money and resources in implementing its order, they were funding a confidential informant as well as three M.C.S.O. deputies or posse members to be in Seattle, Wash., accruing overtime, travel and salary expenses, as well as significant technology costs, attempting to construct some bogus conspiracy theory to discredit this court," Judge Snow said in court, referring to the sheriff's office.

He took to referring to the investigation as the "Seattle operation" and sounded skeptical when describing the reasoning and results of Mr. Montgomery's work. He said Mr. Montgomery had "allegedly" used

information "harvested by the C.I.A. and confiscated by him" when he was a government software contractor.

The materials, the judge said, included fragments of email messages between the Justice Department and a former clerk of Judge Snow's, as well as snippets of phone calls Mr. Montgomery claimed to have tracked between Judge Snow and the former attorney general, Eric H. Holder Jr., as well as with other high-ranking Justice Department officials.

On the stand, Deputy Sheridan said Mr. Montgomery had "pulled data from American citizens for the C.I.A.," an assertion that the agency has denied.

When Judge Snow suggested that the materials provided by Mr. Montgomery were "junk," Deputy Sheridan and Sheriff Arpaio agreed.

But the tale of the conspiracy has nonetheless reverberated from the glass-and-steel Sandra Day O'Connor United States Courthouse here to the halls of the Justice Department and the Pentagon. Last month, Judge Snow asked Michele M. Iafrate, who is representing Sheriff Arpaio in the civil contempt case, to write to the C.I.A., informing it that her client may be in possession of some of its materials.

The cache is also said to include bank account numbers and balances for about 50,000 residents of Maricopa County, Deputy Sheridan told Judge Snow.

Mr. Montgomery, however, could just be bluffing: His reputation, easily uncovered with a cursory search, includes ample allegations of deception. Federal officials came to believe that he had sold antiterrorism technology that proved to be a hoax. ==He has denied wrongdoing in a lawsuit.==

In 2007, he falsely accused the governor of Nevada at the time, Jim Gibbons, of having received kickbacks from Mr. Montgomery's former

**ELSEWHERE ON NYTIMES.COM**



**A Thirsty Colorado Is Battling Over Who Owns Raindrops**

- Ex-A.I.G. Chief Wins Bailout Suit, but Gets No Damages

- In A.I.G. Case, Surprise Ruling That Could End All Bailouts



employer to help it secure secret federal defense contracts. Two years later, Mr. Montgomery was arrested on charges that he had written $1 million in bad checks at a Las Vegas casino. A court hearing is scheduled for Aug. 12. He filed for personal bankruptcy that year, over mounting gambling debts.

"This guy hired a person previously found to be a con man," said Dan Pochoda, senior counsel for the American Civil Liberties Union of Arizona, which represents the plaintiffs in the case against Sheriff Arpaio.

The sheriff's office certified Mr. Montgomery as a confidential informant. On the stand, Sheriff Arpaio said he did not recall how much money Mr. Montgomery had gotten for his work.

Stephen Lemons, the Phoenix New Times columnist who first reported the link between Mr. Montgomery and Sheriff Arpaio, said he had relied on information from "longtime sources," including a former detective in the sheriff's Special Investigations Division, the unit that had been handling Mr. Montgomery.

On Jan. 21, Mr. Lemons wrote about the investigation into Judge Snow's wife. It started, the article said, after a sympathizer wrote a private Facebook message to Sheriff Arpaio, telling him that the judge's wife, an old acquaintance, had mentioned during a casual encounter at a Mexican restaurant that the judge was out to get him.

Larry Klayman, Mr. Montgomery's lawyer, a well-known defender of conservative causes, has mostly taken aim at Mr. Lemons, calling him a "sleazy reporter" working for a "discredited, ultraleftist and pro-illegal immigrant" publication.

But when questioned by Judge Snow in court, Sheriff Arpaio and Deputy Sheridan confirmed what the judge had highlighted: The investigations described in Mr. Lemons's reporting were real.

_____

A version of this article appears in print on June 16, 2015, on page A13 of the New York edition with the headline: A Sheriff, an Informant, and a Judge on the Spot.

Order Reprints | Today's Paper | Subscribe

Exhibit C

Cecilia D. Wang (*Pro Hac Vice*)
cwang@aclu.org
ACLU Foundation
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0775
Facsimile: (415) 395-0950

Daniel J. Pochoda
dpochoda@acluaz.org
Joshua Bendor
jbendor@acluaz.org
ACLU Foundation of Arizona
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
Facsimile: (602) 650-1376

*Attorneys for Plaintiffs (Additional attorneys
for Plaintiffs listed on next page)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Manuel de Jesus Ortega Melendres, *et al.*, | ) ) ) | CV-07-2513-PHX-GMS |
| Plaintiffs, | ) ) ) | **RESPONSE IN OPPOSITION TO SHERIFF ARPAIO AND CHIEF** |
| v. | ) ) ) | **DEPUTY SHERIDAN'S MOTION FOR RECUSAL OR** |
| Joseph M. Arpaio, *et al.*, | ) ) | **DISQUALIFICATION OF THE COURT** |
| Defendants. | ) ) ) | |

Additional Attorneys for Plaintiffs:

Andre I. Segura (*Pro Hac Vice*)
asegura@aclu.org
ACLU Foundation
Immigrants' Rights Project
125 Broad Street, 17th Floor
New York, NY 10004
Telephone: (212) 549-2676
Facsimile: (212) 549-2654

Priscilla G. Dodson (*Pro Hac Vice*)
pdodson@cov.com
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-5996
Facsimile: (202) 778-5996

Anne Lai (*Pro Hac Vice*)
alai@law.uci.edu
401 E. Peltason, Suite 3500
Irvine, CA 92697
Telephone: (949) 824-9894
Facsimile: (949) 824-0066

Jorge M. Castillo (*Pro Hac Vice*)
jcastillo@maldef.org
Mexican American Legal Defense and
Educational Fund
634 South Spring Street, 11th Floor
Los Angeles, California 90014
Telephone: (213) 629-2512
Facsimile: (213) 629-0266

Stanley Young (*Pro Hac Vice*)
syoung@cov.com
Hyun S. Byun (*Pro Hac Vice*)
hbyun@cov.com
Covington & Burling LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Telephone: (650) 632-4700
Facsimile: (650) 632-4800

Tammy Albarran (*Pro Hac Vice*)
talbarran@cov.com
Lauren E. Pedley (*Pro Hac Vice*)
lpedley@cov.com
Covington & Burling LLP
One Front Street
San Francisco, CA 94111
Telephone: (415) 591-7066
Facsimile: (415) 955-6566

## INTRODUCTION

Plaintiffs respectfully submit this Response in Opposition to Sheriff Arpaio and Chief Deputy Sheridan's Motion for Recusal or Disqualification of the Court. The motion fails to meet the standards for recusal in 28 U.S.C. §§ 144 and 455, and runs afoul of the long-settled principle that rulings and judicial remarks made during the course of litigation are almost never a basis for recusal. *Liteky v. United States*, 510 U.S. 540, 550-51 (1994). The motion also fails to demonstrate actual bias or an appearance of bias. The Court's actions—questioning the movants about MSCO investigations—were proper and relevant to the ongoing contempt hearing and the question of remedies to ensure compliance with prior orders. The motion is also untimely and appears to be filed for purposes of manipulation and delay. In the words of ethics expert Professor Stephen Gillers, each of the asserted grounds for recusal "is baseless. Some are frivolous." Gillers Decl. ¶ 5. The motion should be denied.

## FACTUAL BACKGROUND

The procedural history of this case is centrally relevant under the recusal standard, since the Court's actions and statements must be viewed in light of the evidence it has seen. *Liteky*, 510 U.S. at 550-51.

### Evidence of Sheriff Arpaio and Chief Deputy Sheridan's Defiance of the Court

During the 18 months between the issuance of the Supplemental Permanent Injunction [Doc. 606] and the beginning of the contempt hearing on April 21, 2015, the Court saw evidence that top commanders of the MCSO, including Sheriff Arpaio and Chief Deputy Sheridan, had repeatedly violated court orders, made statements that mischaracterized and disparaged the Court's orders to MSCO personnel, and expressed defiance towards the Court's orders. Those statements are set forth in Plaintiffs' Memorandum of Law and Facts re Contempt Proceedings and Request for Order to Show Cause at 12-16 [Doc. 843], incorporated by reference here. *See also* Tr. of Status Conference (Oct. 28, 2014) at 68:25-72:20. Among other things, in August 2013, Sheriff

Arpaio stated in a letter to supporters that he "won't stand for" a Court-appointed monitor. [Doc. 843 at 15]. And during the contempt hearing, Plaintiffs introduced a video recording of a press interview in October 2013, after issuance of the Supplemental Permanent Injunction, in which the Sheriff proclaimed, "I'm an elected constitutional sheriff, and no one is going to take away my authority that I have under the Constitution." Ex. 193C; Tr. of Apr. 23, 2015 at 581:25-582:17. And in October 2014, Sheriff Arpaio made another defiant statement, telling a reporter that he would conduct the Guadalupe operation—one of the saturation patrols the Court held to have violated Plaintiffs' constitutional rights—"all over again." Tr. of Oct. 28, 2014 at 61:9-77:5; Tr. of Apr. 23, 2015 at 583:20-584:6.

**Grounds for Civil Contempt**

In addition, over a period of months starting in May 2014, the three charged grounds for contempt came to light. In April-May 2014, a former MCSO deputy, Charley Armendariz, who had been a key witness at trial, was arrested and subsequently committed suicide. MCSO searched Armendariz's home pursuant to a criminal warrant. The search ultimately revealed, among other things, that there was a widespread practice among MCSO personnel of recording traffic stops, that MCSO had no policy governing the recording of traffic stops, and that such recordings should have been disclosed to Plaintiffs before trial, but were not. Tr. of of Dec. 4, 2014 at 22:15-22:25. The failure to disclose the recordings before trial is one of three charged grounds for civil contempt. [Doc. 880 at 8, 18-21].

The second ground for contempt arose on May 14, 2014. During a status conference on that date, the Court ordered Sheriff Arpaio and Chief Deputy Sheridan to cooperate with the Monitor in formulating a plan to "quietly" collect the recordings of traffic stops throughout MCSO. [Doc. 880 at 22]; Tr. of May 14, 2014 Status Conference at 61 [Doc. 700]. The movants violated that court order that same day, by putting into action a plan without the Monitor's approval, and then agreeing to a different plan in

1  consultation with the monitor, while failing to disclose that the initial, unapproved plan

2  had already been implemented.  [Doc. 880 at 23].

3        The third ground for contempt came to light during the November 20, 2014 status

4  conference when Defendants' counsel disclosed that one of the traffic stop recordings

5  recovered by the MCSO during the Armendariz investigations demonstrated that deputies

6  had violated the Court's preliminary injunction order.  Counsel also revealed that the

7  Court's preliminary injunction order had never been communicated to MCSO deputies.

8  Tr. of Nov. 20, 2014 at 67:10-67:24 [Doc. 804].

9  **<u>Relevance of MCSO's Internal Investigations</u>**

10        During the same period leading to the contempt hearing, the adequacy of

11  MCSO's internal investigation processes became a central issue.  Immediately upon

12  learning of the Armendariz investigations in May 2014, Plaintiffs raised concerns about

13  MCSO's internal investigation process.  Tr. of May 14, 2014 at 102:6-18.  In September

14  2014, the Monitor reported serious deficiencies with MCSO's Armendariz-related

15  internal investigations.  [Doc. 795-1].  Plaintiffs also raised numerous issues with

16  MCSO's internal investigations and gave notice of their intent to seek remedies to protect

17  the interests of the Plaintiff class.  *See* Plaintiffs' Response to the Monitor's Report at 7-

18  10 (Oct. 21, 2014) [Doc. 753]; Tr. of Dec. 4, 2014 at 23:1-24:21 [Doc. 812].

19        Prior to the beginning of the contempt hearing on April 21, 2015, the Court

20  indicated that it would not limit the scope of the evidence to liability for civil contempt,

21  but would take evidence on the remedies needed to ensure compliance with the Court's

22  prior orders, with a particular focus on the adequacy of MCSO's internal investigations.

23  *See*, *e.g.*, Tr. of Mar. 20, 2015 at 11:6-12, 12:21-25, 13:1-21; Tr. of Apr. 21, 2015 at

24  15:19-22; [Doc. 1007]; [Doc. 880 at 25].

25  **<u>Questioning About Defendants' Investigations of the Court</u>**

26        During the contempt hearing, as during the bench trial, the Court questioned

27  witnesses after the parties' counsel, and gave counsel an opportunity to object to

28

questions and to re-examine the witnesses after its examination. On April 23, 2015, the Court questioned Sheriff Arpaio, beginning with the grounds for civil contempt. The Court also questioned the Sheriff about the re-assignment of Captain Steven Bailey from the command of the Special Investigations Division, with oversight of its subunit the Human Smuggling Unit (which had been primarily responsible for the constitutional violations found after trial), to the command of the Internal Affairs unit. Tr. of Apr. 23, 2015 at 637:2-642:22. Bailey's reassignment occurred during a time when the Human Smuggling Unit was under investigation by the Internal Affairs department because of misconduct uncovered after Deputy Armendariz's arrest and death, and the apparent conflict was an issue in the litigation leading up to the contempt hearing.

The Court then questioned Sheriff Arpaio about an article that had appeared in the *Phoenix New Times* newspaper on June 4, 2014, reporting that two MCSO detectives, Brian Mackiewicz and Travis Anglin, a member of the MCSO's civilian "Cold Case Posse," Mike Zullo, and a paid confidential informant named Dennis Montgomery, were engaged in an investigation of a "bizarre conspiracy theory" that the Court and the U.S. Department of Justice were conspiring to "get" Sheriff Arpaio. Wang Decl., Ex. A. The Court questioned the Sheriff about the source of funding for the investigation and whether Captain Bailey was involved in that process. Tr. of Apr. 23, 2014 at 658:4-659:1.

During the Court's questioning of Sheriff Arpaio about the MCSO-Montgomery investigation reported in the *Phoenix New Times* article, the Sheriff testified that there was a second investigation involving the Court. The Sheriff testified that an outside investigator hired by Defendants' then-counsel had investigated an allegation that the Court's spouse had stated to a woman named Grissom that "Judge Snow wanted to do everything to make sure I'm not elected." Tr. of Apr. 23, 2015 at 654:6-655:12.

The next day, on April 24, 2015, Defendants' counsel examined Chief Deputy Sheridan about the investigations implicating the Court and the Court's spouse. After

4

1    asking defense counsel if she had any objection and emphasizing that she should interrupt

2    with any objection, Tr. of Apr. 24, 2015 at 966:4-11, the Court joined in questioning of

3    Chief Deputy Sheridan on the subject of Karen Grissom's allegations about the Court's

4    spouse.  In response to the Court's questions, Sheridan testified that Defendants' counsel

5    had hired a private investigator who had interviewed Karen Grissom and her family, and

6    that MCSO did not do anything to follow up on the investigation. *Id.* at 968:5-9.  The

7    Court then proceeded to question Chief Deputy Sheridan about the grounds for contempt,

8    MCSO's internal affairs operations, and other matters, and finally asked Chief Deputy

9    Sheridan about the MCSO-Montgomery investigation.

10        Chief Deputy Sheridan testified and stated publicly that MCSO ultimately decided

11   not to pursue the investigation of the Grissom allegations relating to the Court's spouse.

12   Tr. of Apr. 24, 2015 at 968:5-9; Tr. of May 14, 2015 at 10:1-24.  Both Arpaio and

13   Sheridan testified that they concluded that confidential informant Dennis Montgomery

14   was not credible.  Tr. of Apr. 23, 2015 at 650:18-25, Tr. of Apr. 24, 2015 at 961:1-11,

15   1002:14-15.  Arpaio, however, testified that he did not know whether the Montgomery

16   investigation was still ongoing.  Tr. of Apr. 23, 2015 at 652:5-6.  Documents later

17   produced by the Defendants indicate that the MCSO-Montgomery investigation

18   continued at least up until the eve of the contempt hearing.  Wang Decl., Ex. E.

19        The Court directed the Sheriff to preserve all documents relating to both of these

20   investigations.  Tr. of Apr. 23, 2015 at 653:9-654:2, 655:13-17, 656:3-6, 656:25-657:2.

21   The Court later directed that copies of the documents be produced and instructed defense

22   counsel to review the material for attorney-client privilege, work product, and

23   confidential information.   Tr. of May 8, 2015 at 30:1-4.  The Court also sua sponte raised

24   a potential security issue about documents that Dennis Montgomery purportedly had

25   obtained from the U.S. Central Intelligence Agency, and proposed that the Monitor and

26   Defendants review such documents prior to disclosure to the Plaintiffs, and that defense

27   counsel communicate with the CIA.  Both Plaintiffs' and Defendants' counsel agreed to

28

5

that proposal.  Tr. of May 8, 2015 at 30:25-31:15.  Contrary to Defendants' assertions, the Court did not order the production of documents that may be protected by the attorney-client privilege or work product doctrine.

At the close of the four days of evidence, the Plaintiffs had not completed their case-in-chief.  Prior to the evidentiary hearing, on April 7, 2015, the Court had anticipated that four days of testimony might be insufficient and tentatively set additional dates for a continuation of the evidentiary hearing, on June 16-19 and 23-26, 2015.  Tr. of Apr. 7, 2015 at 32:13-23.

## ARGUMENT

### I.     The Court's Actions During the Contempt Hearing Do Not Show Actual Bias and Are Not a Ground for Recusal

In moving to disqualify the Court based upon actual bias under 28 U.S.C. § 455(b)(1), Sheriff Arpaio and Chief Deputy Sheridan point to the Court's actions and statements during the contempt proceeding.[1]  The motion therefore fails because "rulings and conduct" during litigation "almost never constitute a valid basis for a bias or partiality motion."  *Liteky*, 510 U.S. at 555; *see also In re Marshall*, 721 F.3d 1032, 1041 (9th Cir. 2013); *United States v. McTiernan*, 695 F.3d 882, 891 (9th Cir. 2012).  Judicial actions or remarks in the litigation will be a ground for recusal only if "they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible."  *Liteky*,

---

[1] Although they do not assert it as a basis for recusal, the movants insinuate that the timing of the Court's trial ruling was "curious and problematic" because it issued nine months after the bench trial and purportedly one week before a recall petition against the Sheriff was due.  Defendants' imputation of bad intent due to the time it took the Court to issue its 142-page trial ruling is unwarranted.  The movants also fail to mention that the Sheriff faced a regular election six months earlier, in November 2012 (*see* http://recorder.maricopa.gov/electionarchives/2012/11-06-2012%20Final%20Summary%20Report.pdf)—a more opportune time for a court, if it had been biased, to time a ruling for improper purposes.

510 U.S. at 555; *United States v. Wilkerson*, 208 F.3d 794, 797 (9th Cir. 2000). The motion entirely fails to meet this standard.

As evidence of actual bias, the motion cites only "rulings and conduct" during the contempt hearing—that the Court asked leading questions on "irrelevant matters; offered "his own testimony"; was "argumentative" with Chief Deputy Sheridan on the stand; interrupted Chief Deputy Sheridan and "challenged" his decision to use Dennis Montgomery as a confidential informant; ordered the production of documents relating to non-party Dennis Montgomery and his attorney Larry Klayman "that may be protected by the work product doctrine or attorney client privilege"; inquired into matters "unrelated to the contempt proceeding" and thereby purportedly deprived Sheriff Arpaio of his due process rights; and "improperly expanded" the Monitor's authority into purportedly irrelevant matters. These are matters that should be raised, if at all, through appeal, not through a recusal motion. *Liteky*, 510 U.S. at 555.

The motion also mischaracterizes the record. The Court questioned Sheridan about how the MCSO-Montgomery investigation was conducted in order to elicit the evidence. Tr. of Apr. 24, 2015 at 1000:19-1008:13. Nothing in the course of that examination can fairly be construed as "argumentative," as the movants claim. But even if it were true that the Court expressed hostility toward Sheridan, that would not be a ground for recusal. *See* Gillers Decl. ¶ 7.

> The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed toward the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not therefore recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task.

*Liteky*, 510 U.S. at 550-51. Thus, a judge's "expressions of impatience, dissatisfaction, annoyance, and even anger" during litigation are not a ground for recusal. *Id.* at 555-56.

Moreover, none of the challenged actions by the Court was erroneous, much less a ground for recusal. It is entirely proper for a court to examine witnesses and to comment on the evidence (which Sheriff Arpaio and Chief Deputy Sheridan attempt to

7

mischaracterize as "testifying," *see* Gillers Decl. ¶ 8). Fed. R. Evid. § 614(b). A court "should not hesitate to ask questions for the purpose of developing the facts; and it is no ground of complaint that the facts so developed may hurt or help one side or the other." *Barba-Reyes v. United States*, 387 F.2d 91, 93 (9th Cir. 1967); *see also United States v. Larson*, 507 F.2d 385, 389 (9th Cir. 1994); *United States v. Robinson*, 449 F.2d 925, 933 (9th Cir. 1971); *Hanson v. Waller*, 888 F.2d 806, 810, 813 (11th Cir. 1989) (judges may ask leading questions even in jury trial); *Ruiz v. Estelle*, 679 F.2d 1115, 1130 (5th Cir. 1982), *amended in part and vacated in part on other grounds*, 688 F.2d 266 (5th Cir. 1982).

The Court's questions do not indicate any bias. Gillers Decl. ¶¶ 16-20. They were a proper exercise of the Court's inherent power to protect the integrity of the judicial process and ensure compliance with its prior orders, as they were relevant to Sheriff Arpaio's attitude toward the Court and compliance with the Court's orders and to the subject of MCSO's internal investigations. The *Phoenix New Times* article that the Court introduced as an exhibit indicated that the MCSO-Montgomery investigation was aimed at developing a conspiracy theory to discredit the Court during that same time period (October 2013 through April 2015) in which the movants had expressed defiance of the Court's Supplemental Permanent Injunction, in which there were numerous instances of noncompliance with the Court's orders, and leading up to the April evidentiary hearing on contempt charges and remedies. Documents later produced by the Defendants support the newspaper account that—contrary to the testimony of Arpaio and Sheridan—the MCSO-Montgomery investigation targeted the Court. Wang Decl., Ex. B, F. The documents also reveal that MCSO personnel continued to press Dennis Montgomery for results up until the eve of the contempt hearing, even though they had already concluded that he was not credible. Wang Decl., Ex. C, D, E. The evidence thus

1  suggested that the MCSO-Montgomery investigation might be an attempt to undermine

2  the Court's authority rather than comply with its lawful orders.[2]  This was particularly

3  problematic in light of the Monitor's recent finding that MCSO was only 29 percent in

4  compliance with the Supplemental Injunction despite the passage of one-and-a-half years.

5      The movants' allegation that the Court "requested that the U.S. Attorney function

6  as his investigator to determine whether criminal contempt of his Preliminary Injunction

7  had occurred" (Mot. at 7) is false.  The Court invited the U.S. Attorney's Office to attend

8  status conferences in this case so that the government would be apprised of the facts and

9  would be in a position to make an independent determination whether to proceed with a

10  criminal contempt prosecution, if the Court were to make a referral in the future.  Tr. of

11  Dec. 4, 2014 at 29:5-9, 29:24-30:3.  Defendants did not object to the presence of a federal

12  prosecutor or even to the Court's suggestion that relevant documents be provided to the

13  U.S. Attorney's Office.  *Id.* at 30:4-14.  Moreover, Defendants themselves subsequently

14  sought the participation of the United States Attorney's Office in their efforts to settle the

15  contempt issues.  Tr. of Feb. 26, 2015 at 32:23-34:1, 34:2-6, 34:8-17.  Contrary to the

16  movants' assertion, the U.S. Attorney's Office never declined any referral, as none has

17  yet been made.  Tr. of Mar. 20, 2015 at 28:2-6.

18

19

---

20  [2] Even more troubling, as the Court noted in a post-hearing status conference, the evidence indicates that Dennis Montgomery informed MCSO personnel—with Chief

21  Deputy Sheridan's knowledge—that he was using a database of information "harvested by the CIA and confiscated by him" in his investigation, and also purported

22  to be tracking telephone calls between the Court, the Attorney General, the Assistant Attorney General, and the U.S. Attorney for the District of Arizona.  Tr. of May 14,

23  2015 at 44:22-45:2, 45:10-16; Wang Decl., Ex. C, F.  This implicates possible violations of federal criminal laws by MCSO personnel in the course of the MCSO-

24  Montgomery investigation.  See, e.g., 18 U.S.C. §§ 793(b)-(f) (taking or communication of documents relating to national defense); 798 (disclosure of

25  classified information); 1503 (intimidation of federal court and obstruction of justice); 1509 (obstruction of court orders); 1924 (unauthorized removal of classified

26  information); 2511 (intercepting electronic communications); 2701 (unlawful access to stored communications).

27

28

9

Further, the Court properly authorized the Monitor to investigate MCSO's "investigative operations." Overruling the Defendants' objections, the Court stated that it would not require the Monitor to give Defendants advance notice of topics of interviews, but that Defendants could contemporaneously raise any objections during any interviews and that the Court would make itself available to hear such objections. The Court further stated that the Monitor's investigations would be limited to the enforcement of the Court's prior orders. Tr. of May 14, 2015 at 53:12-56:25. There was nothing improper in these orders since they were directly relevant to enforcing compliance with the Court's prior orders.

Sheriff Arpaio and Chief Deputy Sheridan also mischaracterize the record when they allege that the Court ordered the disclosure of confidential materials that "may be" subject to the attorney-client privilege or work product immunity.[3] In fact, the Court gave the Defendants an opportunity to review documents for privilege and to produce a log prior to producing documents relating to the MCSO-Montgomery investigation, and the Court also proposed procedures to ensure that any confidential or sensitive documents would be protected from disclosure. Tr. of May 8, 2015 at 30:1-4, 30:25-31:15. Moreover, even if the Court had issued such an order, any objection should be addressed through ordinary litigation, not through a recusal motion. *Liteky*, 510 U.S. at 555.

Finally, Sheriff Arpaio and Chief Deputy Sheridan's assertion that the Court violated their due process rights by failing to give notice of its intent to question them about the MCSO-Montgomery investigations is misplaced. The Court stated clearly prior to the beginning of the evidentiary hearing that subjects relating to remedies, and

---

[3] The movants also allege that the Court "apparently took evidence outside of court." Mot. at 15. In fact, the Court stated on the record that it had been informed that the Cold Case Posse "has its own funds" and asked Sheriff Arpaio whether that was "possible." Tr. of Apr. 23, 2015 at 658:1-2. Defense counsel did not object. The record reveals that the Court did not take the information at face value, but asked the Sheriff whether it was true. The Court's actions were proper. Gillers Decl. ¶ 15.

10

1  particularly relating to MCSO investigations, would be within the scope of the hearing.

2  *See* Tr. of Mar. 20, 2015 at 11:6-12, 12:21-25, 13:1-21; [Doc. 880 at 25]; [Doc. 1007 at

3  2]; Tr. of Apr. 21, 2015 at 15:19-22. Arpaio and Sheridan were not unfairly surprised;

4  they acknowledged reading the *New Times* article and were also provided a copy by the

5  Court.  Tr. of Apr. 23, 2015 at 642:17-25, 643:1-24; Tr. of Apr. 24, 2015 at 959:9-10,

6  959:17-18. Defense counsel made no objection to the Court's questions and indeed

7  initiated the questioning of Sheridan on this subject.

8

9        **II.**      **Neither the Court nor the Court's Spouse Has a Disqualifying Interest**

10       Sheriff Arpaio and Chief Deputy Sheridan argue for recusal under 28 U.S.C.

11  § 455(b)(5)(iv), which  provides for recusal when a judge, his or her spouse, or a person

12  within a third degree of relationship to either of them, "[i]s to the judge's knowledge

13  likely to be a material witness in the proceeding," and under 28 U.S.C. § 455(b)(1),

14  which provides for recusal when a judge "has a personal bias or prejudice concerning a

15  party, or personal knowledge of disputed evidentiary facts concerning the proceeding."

16  These arguments fail on the merits.

17       First, the movants argue that recusal is required because the Court's brother-in-law

18  is a partner in the Washington, D.C. office of Covington & Burling (Mot. at 13), but they

19  *expressly* waived any recusal argument when they learned of this fact in 2012.  *See* [Doc.

20  537 (order setting status conference on issue)]; Tr. of June 29, 2012 at 5:19-7:2 (Court's

21  offer to recuse on request of any party); *id.* at 16:6-17:2 (Defendants statement that they

22  would be prejudiced by Court's recusal and any order vacating prior orders);  [Doc. 541

23  (Defendants' written waiver of appeal of any recusal issue)]; [Doc. 542].  Moreover, the

24  Court's previous ruling on the merits was correct.  Gillers Decl. ¶¶ 9-10.

25       Sheriff Arpaio and Chief Deputy Sheridan also assert that the Court must recuse

26  because the interests of the Court and the Court's spouse are "substantially affected by

27  the outcome of this proceeding." Mot. at 13.  The movants now insinuate that the Court's

28

1   interests are at stake because the allegations of the MCSO-Montgomery investigation—

2   that the Court conspired with the Attorney General of the United States and others to

3   subvert the random case assignment process—may actually be true. Mot. at 13. This

4   assertion fails because both Sheriff Arpaio and Chief Deputy Sheridan testified that they

5   concluded that the MCSO-Montgomery investigation was not credible and indeed was

6   "junk." Tr. of Apr. 23, 2015 at 650:18-25; *see also* Tr. of Apr. 24, 2015 at 961:1-11,

7   1002:14-15. Documents relating to the MSCO-Montgomery investigation support that

8   testimony. Wang Decl., Ex. C, D, E.

9         Sheriff Arpaio and Chief Deputy Sheridan further assert that recusal is required

10   under § 455(b)(5) because the Court's spouse is a material witness. While they do not

11   explain, presumably they assert that she is a witness on the factual issues arising from

12   their investigation of Karen Grissom. This assertion should be rejected because Chief

13   Deputy Sheridan testified that after a private investigator hired by their counsel

14   interviewed Ms. Grissom and her family members in 2013, MCSO chose not to pursue

15   the allegations. Tr. of Apr. 24, 2015 at 968:5-9; Tr. of May 14, 2015 at 10:1-24. And

16   Defendants' own counsel, after reviewing the private investigators' report, stated that

17   "the Grissom information is so fundamentally flawed in its substance that it likely cannot

18   be used in a Rule 60 motion, appeal, or otherwise, without the lawyer who does so

19   violating the federal courts rule of civil procedure and the Arizona Rules of Professional

20   Conduct." [Doc. 1115 at 13-14 (letter from Timothy J. Casey to Joseph M. Arpaio dated

21   Nov. 6, 2013)]. This is likely because of the numerous inconsistencies in the various

22   statements that Karen and Dale Grissom made about their meeting with Mrs. Snow. *See*

23   Gillers Decl. ¶¶ 4.1-4.4, 12.

24         Notably, in asserting the grounds for recusal for actual bias, Sheriff Arpaio and

25   Chief Deputy Sheridan do not explicitly include Karen Grissom's allegation which—in

26   the strongest version, appearing in her Facebook message to the Sheriff more than a year

27   after her alleged conversation with Mrs. Snow—was that that Mrs. Snow stated that the

28

Court "hates" the Sheriff and "will do anything to get [him] out of office."  *See* Mot. at 14-16 (grounds for assertion of actual bias based upon Court's statements and actions during contempt proceedings).  But in any event, the Court's spouse is not a material witness on any issue in this litigation.  Whether Mrs. Snow made the alleged statement to Mrs. Grissom is not admissible evidence of the Court's state of mind.  Gillers Decl. ¶¶ 13-14.  Moreover, a court has an independent and self-executing obligation under 28 U.S.C. § 455(b)(1) to recuse if it has an actual bias, and the Court has not done so here. Gillers Decl. ¶ 14.

### III.  No Reasonable Observer Would Perceive an Appearance of Bias

Sheriff Arpaio and Chief Deputy Sheridan move for recusal based upon 28 U.S.C. § 455(a), which requires "[a]ny justice, judge, or magistrate judge of the United States [to] disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  Section 455(a) imposes an objective standard, requiring recusal when "a reasonable third-party observer would perceive that there is a 'significant risk' that the judge will be influenced by the threat and resolve the case on a basis other than the merits."  *United States v. Holland*, 519 F.3d 909, 914 (9th Cir. 2008).  The standard is applied based upon "all the relevant facts" and an examination of the record and the law.  *Id.* (citing *LoCascio v. United States*, 473 F.3d 493, 496 (2d Cir. 2007)).

As an initial matter, Sheriff Arpaio and Chief Deputy Sheridan do not clearly state the basis for their motion under § 455(a), but Plaintiffs presume that it is based upon the same allegations underlying their assertions under §§ 455(b)(1) and (b)(5).   The motion therefore should fail because a reasonable observer would understand that in the context of the record, as set forth above, none of the Court's conduct gives rise to any appearance of improper bias.  "Rumor, speculation, beliefs, conclusions, innuendo, suspicion, opinion, and similar non-factual matters" are generally not sufficient to warrant recusal under § 455(a).  *Clemens*, 428 F.3d at 1178.  Nor are "baseless personal

13

1    attacks on or suits against the judge by a party," or "quotes attributed to the judge or

2    others, but which are in fact false or materially inaccurate or misleading," or "attempts to

3    intimidate the judge." *Id.* at 1179.

4        Moreover, Sheriff Arpaio and Chief Deputy Sheridan's argument under § 455(a)

5    should fail because courts have held that a party cannot manufacture a basis for recusal.

6    In this case, the movants appear to argue that there is an appearance of bias because they

7    themselves launched investigations to develop proof that the Court is biased, one of those

8    investigations (the MCSO-Montgomery investigation) was leaked to the press,[4] and the

9    Court inquired about the news report, leading to the Sheriff's testimony about both the

10    MCSO-Montgomery and Grissom investigations.  Contrary to the testimony of Arpaio

11    and Sheridan, the investigations were done by MCSO and MSCO's paid agents and they

12    did attempt to call the Court's impartiality into question.  Sheriff Arpaio's testimony that

13    the MCSO-Montgomery investigation did not target the Court is contradicted by

14    documents later produced by Defendants.  Wang Decl., Ex. F.  And when asked whether

15    MCSO had investigated the Court's spouse, Chief Deputy Sheridan equivocated by

16    answering "it depends on how you define, 'investigated your wife.'"  Tr. of Apr. 24, 2015

17    at 967:11-14.  But in fact, Chief Deputy Sheridan's complete testimony and documents

18    produced under an order by Magistrate Judge Boyle demonstrate that the investigation

19    was aimed at determining whether Mrs. Snow made the statement.  [Doc. 1115].

20        Controlling cases do not require recusal in these circumstances.  In cases where a

21    party has made allegations against the Court, for example, the Ninth Circuit has held that

22    recusal is not required.  "A judge is not disqualified by a litigant's suit or threatened suit

23    against him, … or by a litigant's intemperate and scurrilous attacks."  *United States v.*

24

25

26    [4] One of the documents produced by the Defendants suggests that an MCSO
investigator leaked the MCSO-Montgomery investigation to the *Phoenix New Times*.

27    Wang Decl., Ex. B.

28

1     *Studley*, 783 F.2d 934, 940 (9th Cir. 1986) (citing *Ronwin v. State Bar of Ariz.*, 686 F.2d

2     692, 701 (9th Cir. 1981); *United States v. Grismore*, 564 F.2d 929, 933 (10th Cir. 1977)).

3     Otherwise, "defendants could readily manipulate the system … [and] force delays….

4     Such blatant manipulation would subvert our processes, undermine our notions of fair

5     play and justice, and damage the public's perception of the judiciary." *United States v.*

6     *Holland*, 519 F.3d 909, 915 (9th Cir. 2008); *see also United States v. Spangle*, 626 F.3d

7     488, 496 (9th Cir. 2010) (court properly declined to recuse after police found personal

8     information about judge and judge's family in the defendant's car). Numerous cases

9     have held that "a party cannot effect recusal of a trial judge by the party's own actions,"

10     such as through statements critical of the judge or accusing the judge of wrongdoing.

11     *United States v. Cerrella*, 529 F. Supp. 1373, 1380 (S.D. Fla. 1982) (citing *United States*

12     *v. Bray*, 546 F.2d 851 (10th Cir. 1976); *United States v. Garrison*, 340 F. Supp. 952, 957

13     (E.D. La. 1972); *United States v. Fujimoto*, 101 F. Supp. 293, 296 (D. Haw. 1951)). In

14     *Bray*, 546 F.2d at 857-58, the Tenth Circuit rejected a recusal motion based upon the

15     moving party's accusation that the judge had committed bribery and conspiracy.

16     Similarly, the First Circuit held that negative statements about the court in a newspaper

17     the moving party owned, well into the proceedings, could not require recusal because

18     otherwise a party might manipulatively create a basis for recusal. *In re Union Leader*

19     *Corp.*, 292 F.2d 381, 388-89 (1st Cir. 1961). In short, the law does not permit a party to

20     trigger recusal at will, simply by alleging that the Court participated in a conspiracy to

21     "get" him.

22         A reasonable observer with full knowledge the record of this case, and the

23     caselaw, would not conclude that there is an appearance of bias.

24

25     **IV.    The Motion Should Be Denied as Untimely**

26         The recusal motion also should be denied because it is untimely. Sheriff Arpaio

27     and Chief Deputy Sheridan knew of Karen Grissom's allegations in August 2013, and

28

documents reveal that they had concluded their interviews on that issue by November 2013—almost *two years* before filing this motion. [Doc. 1115]. Defendants knew of the relationship between the Court and Keith Teel in June 2012—*three years* before filing their motion—and expressly waived any claim to recusal. And to the extent the movants now rely upon an insinuation that the allegations in the MCSO-Montgomery investigation are true, despite their repudiation, they should be foreclosed as they knew Montgomery was not credible at least by November 2014 (Wang Decl., Ex. C), seven months before filing their motion. In light of these extraordinary delays, the recusal motion should be denied as untimely. Gillers Decl. ¶¶ 9, 11-12. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1295 (9th Cir. 1992) (recusal motion untimely when filed seven months after assignment of case to judge and after adverse ruling); *Studley*, 783 F.2d at 939 (recusal motion filed "weeks after" conclusion of trial in which court allegedly exhibited bias was untimely).

These cases are based on the presumption that a party that delays the filing of a recusal motion is presumed to be filing the motion for purposes of manipulation, after suffering adverse rulings. *See E. & J. Gallo Winery*, 967 F.2d at 1295; *United States v. Rogers*, 119 F.3d 1377, 1380 (9th Cir. 1997); *Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 913 (11th Cir. 1983) (recusal "cannot be used as an insurance policy to be cashed in if a party's assessment of his litigation risks turns out to be off and a loss occurs"). In this case, there is good reason to believe that the motion was in fact filed for manipulative purposes. Sheriff Arpaio and Chief Deputy Sheridan attempted repeatedly to avoid the evidentiary hearing on contempt by filing motions to vacate the hearing.[5] It was only after those efforts failed, after the hearing

---

[5] Defendants assert that the Court improperly refused to grant those motions and rejected proposed remedies that Plaintiffs had agreed to as settlement terms. Mot. at 6. This assertion on its face violates the confidentiality provision of Federal Rule of Evidence 408 and also is misleading. Plaintiffs made clear on the record that they (continued…)

16

1    brought forth clear evidence of their willful and systematic violations of the Court's

2    orders,[6] and after the Court indicated in post-hearing status conferences that strong

3    remedies were in order (Tr. of May 8, 2015 at 19:8-21:4), that they finally moved for

4    recusal.[7]  Moreover, after filing the recusal motion, the Defendants initially took the

5    position that ongoing activities toward compliance with the Supplemental Permanent

6    Injunction were stayed, contrary to the terms of the Court's far more limited stay order.

7    Wang Decl., Ex. G; [Doc. 1120].  The timeliness requirement prevents precisely this sort

8    of manipulation.  Gillers Decl. ¶ 11.

9

10   **V.    The Motion Fails To Meet the Requirements for Recusal Under § 144**

11          Finally, the recusal motion fails to meet the requirements of 28 U.S.C. § 144,

12   which provides for reassignment of a case to another judge upon the filing of "a timely

13   and sufficient affidavit that the judge before whom the matter is pending has a personal

14   bias or prejudice either against him or in favor any adverse party."  Section 144 provides

15   that a party may only file one such affidavit in any case.  *See also Adesanya v. West Am.*

16   *Bank*, 1994 WL 56960, at *3 (9th Cir. Feb. 25, 1994) (unpub. op.) (construing recusal

17   motion as filed under § 455 because party previously filed affidavit under § 144).

18   Defendants Sheriff Arpaio, MCSO, and Maricopa County previously moved for the

19

20   never agreed to any settlement.  Tr. of Feb. 26, 2015 at 38:7-11, 41:20-42:24.
     Plaintiffs opposed Defendants' Motion to Vacate because Plaintiffs had not had an
21   opportunity to take discovery relevant to whether Defendants' violations were
     deliberate, or on the adequacy of remedies [Doc. 952 at 2-4], and the Court denied
22   Defendants' motions on that ground.  [Doc. 1003, 1007].

23   [6] For example, the evidence developed during the contempt hearing on April 21-24,
     2015 demonstrated that Chief Deputy Sheridan was not truthful with the Court-
24   appointed Monitor about the events of May 14, 2014 underlying one of the charged
     grounds of contempt.  Tr. of Apr. 24, 2015 at 840:10-841:15; 846:22-848:5; 850:6-11;
25   851:22-25; 853:20-859:19; 861:4-11; 868:19-869:6.

26   [7] Tellingly, immediately after the Court's examination of the Sheriff, his specially
     appearing counsel (who filed the instant motion) stated publicly that there was no basis
27   for recusal of the Court.  Wang Decl., Ex. H.

28

                                        17

1    recusal of Judge Murguia through the filing of an affidavit under § 144.  [Doc. 63].

2    While that affidavit was signed by then-Chief Deputy David Hendershott, it was done on

3    behalf of the Defendants as parties to this litigation.

4         In any event, § 144 does not present any independent basis for recusal.  It is

5    settled that the same substantive and timeliness standards apply whether the statutory

6    basis asserted is § 144 or § 455.  *Liteky*, 510 U.S. at 548 (noting that § 144 "seems to be

7    properly invocable only when § 455(a) can be invoked anyway").  The remaining

8    distinction between § 144 and § 455 appears to be that under § 144, the motion shall be

9    referred to a different district judge.  But that is so only if the judge to whom the motion

10   is directed first determines that the affidavit is timely and sufficient.  *United States v.*

11   *Sibla*, 624 F.2d 864, 868 (9th Cir. 1980); Gillers Decl. ¶ 3.  For all the reasons set forth

12   above, the motion under § 144 should be denied.

13

14                                    **CONCLUSION**

15        Sheriff Arpaio and Chief Deputy Sheridan's motion to disqualify the Court

16   should be denied.

17        RESPECTFULLY SUBMITTED this 12th day of June, 2015.

18

19                              By: /s/ Cecillia D. Wang

20                              Cecillia D. Wang (*Pro Hac Vice*)
21                              Andre I. Segura (*Pro Hac Vice*)
                               ACLU Foundation
22                              Immigrants' Rights Project

23                              Daniel Pochoda
24                              Joshua Bendor
                               ACLU Foundation of Arizona
25
26                              Anne Lai (*Pro Hac Vice*)

27

28
                                        18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Stanley Young (*Pro Hac Vice*)
Tammy Albarran (*Pro Hac Vice*)
Hyun S. Byun (*Pro Hac Vice*)
Priscilla G. Dodson (*Pro Hac Vice*)
Lauren E. Pedley (*Pro Hac Vice*)
Covington & Burling, LLP


Jorge M. Castillo (*Pro Hac Vice*)
Mexican American Legal Defense and
Educational Fund

*Attorneys for Plaintiffs*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2015, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail as indicated on the Notice of Electronic Filing.

<u>/s/ Cecillia D. Wang</u>

Exhibit D



# FREEDOM WATCH

▶ www.FreedomWatchUSA.org

**World Headquarters** 2020 Pennsylvania Avenue, N.W., Suite 345, Washington, DC 20006-1811   ▪ (310) 595-0800   ▪ leklayman@gmail.com

*Via Mail and Facsimile*

June 22, 2015

Mr. Daniel J. Pochoda, Esq.
ACLU Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Facsimile: (602) 650-1376

Ms. Cecillia D. Wang, Esq.
Immigrants' Rights Project
American Civil Liberties Union Foundation
39 Drumm Street
San Francisco, California 94111
Facsimile: (415) 395-0950

Mr. Mike German, Esq.
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
Facsimile: (212) 549-2654

Ms. Susan Herman
President
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
Facsimile: (212) 549-2654

### Re: <u>Demand to Immediately Withdraw As Counsel And to Mitigate Defamation of Dennis Montgomery</u>

Dear Ladies and Gentlemen:

I am writing as general legal counsel for Mr. Dennis Montgomery, who is the subject of unethical, illegal attacks by you and your organization in legal pleadings in the case of *Melendres v. Arpaio* in the U.S. District Court for the District of Arizona (CV-07-2513-PHX-GMS) and a <u>New York Times</u> article of June 15, 2015, written by Ms. Fernanda Santos,

Phoenix, Arizona, Bureau Chief, titled "Twists Outnumber Judges (So Far) in Case Against Arizona Sheriff."

As a result of attacking its own former client Dennis Montgomery, and thereby violating its ethical responsibilities of loyalty and confidentiality, the American Civil Liberties Union Foundation ("ACLU") must now immediately withdraw from representing the *Melendres v. Arpaio* (CV-07-2513-PHX-GMS) Plaintiffs. The ACLU's conflict of interest has matured into an even more egregious conflict as a result of actions by you, the ACLU and the Honorable G. Murray Snow. The Defendants Sheriff Joe Arpaio and Chief Deputy Sheridan objected to the expansion of the case.

The case of *Melendres v. Arpaio* was concluded on the merits in October 2013, and is now in an ongoing contempt phase. Its scope is precisely defined by its final order entered in 2013. Yet the ACLU has now added political exploitation to its efforts to encourage widespread violations of the Immigration and Naturalization Act (INA). In the process of expanding this case, the ACLU is now attacking and harming its own prior client Dennis Montgomery.

Attorneys for the ACLU appearing in the State of Arizona include Mr. Daniel Pochoda, Cecellia Wang, Andre I. Segura, and Joshua Bendor. These attorneys have repeatedly and flagrantly threatened criminal prosecution of Dennis Montgomery, Sheriff Joe Arpaio, Chief Deputy Jerry Sheridan and other personnel of the Maricopa County Sheriff's Office (MCSO). Threatening criminal prosecution to gain advantage in a civil litigation is prohibited by the ethical and other obligations of the legal profession.

According to a warning published by the Arizona State Bar in Arizona Attorney, in its July/August 2009 edition by David D. Dodge, former Chair of the Disciplinary Commission of the Arizona Supreme Court, the prohibition against threats of criminal prosecution under Arizona's old Disciplinary Rule 7-105(a) remains in force in Arizona even though no longer explicitly stated in Arizona's new adoption of the ABA Model Rules of Professional Conduct. [1]

Furthermore, former disciplinary Chair Dodge of the Arizona State Bar warns about threatening criminal prosecution in civil litigation: "What has been overlooked is that knowingly obtaining or seeking to obtain "property" by means of threatening to bring criminal charges against anyone is considered to be extortion, a Class 4 felony in Arizona.3 And engaging in extortionate acts by lawyers is generally discouraged here and elsewhere." *Id.*

Also, as you know, Dennis Montgomery consulted with the ACLU in 2013 and 2014 about his legal circumstances, including with the head litigation attorney to the ACLU in Washington, D.C., Mike German. Montgomery disclosed confidential attorney client information and documents in anticipation of representation and actually received substantive legal advice from the ACLU, prior to meeting with the Attorney General of Arizona with the assistance of Sheriff Joe Arpaio on exactly the same topics as his consultation with the ACLU.

---

[1]    http://www.myazbar.org/AZAttorney/PDF_Articles/0709ethics.pdf

With the ACLU, Dennis Montgomery consulted in furtherance of establishing full legal representation concerning these topics.

During these meetings, Montgomery disclosed confidential information and documents, identified legal issues of concern,[2] and asked for legal advice on many issues in his circumstances. Mike German requested that Montgomery send and provide additional information and documents for the purpose of the ACLU providing future legal representation that Mike German recommended that the ACLU undertake.[3] The ACLU and Montgomery were engaged in confidential discussions which constituted an attorney-client relationship and work product in anticipation of full representation.

Because Mike German and others actually gave Dennis Montgomery legal advice and an evaluation of his legal risks of his situation and asked for more information and documents to further future legal actions by the ACLU on Montgomery's behalf, an attorney-client relationship was actually established. Moreover, consultation in contemplation of a formal attorney-client relationship also triggers ethical, fiduciary and professional responsibilities.

Furthermore, just recently Mr. Daniel Pochoda on behalf of the ACLU made defamatory statements published in that article concerning Dennis Montgomery, along with similar statements made elsewhere by Cecellia Wang and other ACLU attorneys. This letter is to place you on notice pursuant to § 770.02 Florida Statutes (2012) "Notice condition precedent to action or prosecution for libel or slander" that you have published statements concerning our client Dennis Montgomery which constitute defamation *per se*, general defamation and defamation by inference (hereafter "defamatory statements").

You are now on notice that your defamation caused, and is continuing to cause severe damage to Dennis Montgomery personally and in his trade and profession, for which you may be held to account legally. Pursuant to Florida Statutes § 770.02, litigation may be initiated no sooner than five (5) days from your receipt of this letter.

You are also hereby put on notice to immediately take any and all actions to try to mitigate the damage from these false statements, and also to preserve all of your notes and electronic recordings and other documents and things that refer or relate to your article of today as they will be subpoenaed, or subject to discovery should Mr. Montgomery decide to file suit against you, the ACLU, and its attorneys.

---

[2]     Identifying legal issues can highlight and pinpoint the strength and weaknesses of a client's legal situation and risks. Thus, when seeking legal advice from an attorney the questions posed by a client can be as potentially risky if misused as the answers from the attorney. The issues identified can assist a legal opponent in targeting the client.

[3]     General references are required here to protect the substance of the attorney-client discussions and legal advice given to Montgomery from the ACLU.

First, Mr. Daniel Pochoda's statement in the article about Dennis Montgomery in The New York Times (NYT) article is libelous. Mr. Pochoda is quoted in the NYT stating that:

> "This guy hired a person previously found to be a con man," said Dan Pochoda, senior counsel for the American Civil Liberties Union of Arizona, which represents the plaintiffs in the case against Sheriff Arpaio.

Clearly, the false factual assertion that Dennis Montgomery is a con-man, and that he has been previously confirmed to be a con man, is defamation *per se*. The ACLU is claiming that Montgomery committed fraud in business transactions. This is a public statement of criminal conduct, including making false statements to the government under 18 U.S.C. § 1001 and violating the False Claims Act 31 U.S.C. §§ 3729 – 3733 by submitting a claim for payment based upon fraud or misrepresentation. Therefore, the ACLU's statements are defamation *per se* on at least two grounds, claiming commission of a criminal act and dishonesty in one's trade or business.

Because the ACLU previously legally consulted with Montgomery, the ACLU has actual knowledge that any and all such statements are false. One of several topics that Montgomery sought the ACLU's help about was Montgomery being lied about on exactly these topics in exactly these ways. Montgomery sought legal advice about the campaign to preemptively discredit him and silence him as a *bona fide* whistleblower concerning misconduct by the government. That discussion informed the ACLU of the actual falsehood of those smears, in detail, backed up with documentation.

Furthermore, the ACLU has knowledge that Montgomery's involvement with the Attorney General of Arizona and the Maricopa County Sheriff's Office was not about Judge G. Murray Snow or the case of *Melendres v. Arpaio*.[4] Thus, the ACLU has knowledge that Daniel Pochoda's statements to the New York Times are false. Knowledge of the falsehood of the statements establishes actual malice under the law, even though Mr. Montgomery is not a public figure.

---

[4] Ironically, the ACLU's dishonest and unconstitutional illegal practices are exemplified by its now disclosed surveillance of Congressional offices by cookies embedded in email messages. "Ironically, the ACLU actually puts surveillance software into its emails campaigning against government surveillance," reports Patrick Howley, "Exclusive: ACLU Uses Tracking Software To Monitor Capitol Hill Staffers," Daily Caller, June 15, 2015, accessible at: http://dailycaller.com/2015/06/15/exclusive-aclu-uses-tracking-software-to-monitor-capitol-hill-staffers/#ixzz3dLHGXTj4 "The nonprofit civil liberties group uses a software system called 'Capwiz' to insert cookies onto the computers of Capitol Hill staffers who click on links in the emails, multiple Capitol Hill offices recently discovered." *Id.* Hypocritically, the ACLU falsely claims to be the protector of civil liberties and privacy rights as demonstrated by its lawsuit against the National Security Agency and James Clapper.

Moreover, the ACLU has knowledge that Dennis Montgomery cannot legally respond to these smears and defamation without the risk of breaking the law concerning classified information. He sought the ACLU's help with this issue. Thus, the ACLU has knowledge that Mr. Montgomery is unable to answer in detail about the defamation by the ACLU, from whom he sought legal help. This also constitutes actual malice.

Mr. Pochoda, Ms. Wang and other ACLU attorneys are thus working against Mr. Montgomery's interests even out of court.

Furthermore, Mr. Pochoda's and Ms. Wang's attacks upon Mr. Montgomery are a violation of the Daniel Pochoda's and Cecellia Wang's ethical, fiduciary and professional responsibilities toward him of loyalty and confidentiality.[5]

Meanwhile, and most egregiously, the ACLU, by its attorneys Cecellia Wang Daniel Pochoda, Andre I. Segura, and Joshua Bendor, further attacked Dennis Montgomery in the **Response in Opposition to Sheriff Arpaio and Chief Deputy Sheridan's Motion for Recusal or Disqualification of the Court** ("Opposition") filed by the ACLU in *Melendres v. Arpaio* in the U.S. District Court for the District of Arizona.

In Footnote 2 on Page 9, the ACLU accused Dennis Montgomery of committing crimes. In this passage, Cecellia Wang and Daniel Pochoda are clearly working to induce criminal indictments and prosecution against their own client Dennis Montgomery.[6]

Thus, in violation of Ms. Wang's and Mr. Pochoda's ethical, fiduciary and professional responsibilities, they and other ACLU attorneys now seek to cause the indictment and prosecution of Dennis Montgomery, a client who came to the ACLU seeking legal assistance concerning exactly the same topics.

Moreover, Daniel Pochoda, Cecellia Wang and the rest of the ACLU have knowledge of the true facts as a result of those prior confidential attorney-client consultations that the allegations are completely false. The ACLU wrote and advocated in its recent Opposition:

---

[5]     Sheriff Arpaio's attorney filed a motion asking the Honorable G. Murray Snow to exclude these topics from *Melendres v. Arpaio.* Over Arpaio's objection, Judge Snow ruled that the topics are material. Therefore, the ACLU is now adverse to someone who sought legal help from the ACLU on topics officially ruled to be material to that case. The conflict and its materiality were insisted upon by the Plaintiffs and Judge Snow. The conflict of interest became severe and actual in April 2015 when Judge Snow refused Arpaio's motion to exclude the topics from the litigation and ruled that the issues are material to the on-going case.

[6]     Ms. Wang and Mr. Pochoda and other ACLU attorneys make these allegations with the intention that criminal prosecution be initiated. Judge Snow, at the ACLU's urging, ordered that the U.S. Attorney monitor the case. The ACLU traditionally ought to be concerned about blurring lines between the judicial and executive branches.

> Even more troubling, as the Court noted in a post-hearing status
> conference, the evidence indicates that Dennis Montgomery
> informed MCSO personnel—with Chief Deputy Sheridan's
> knowledge—that he was using a database of information
> "harvested by the CIA and confiscated by him" in his
> investigation, and also purported to be tracking telephone calls
> between the Court, the Attorney General, the Assistant Attorney
> General, and the U.S. Attorney for the District of Arizona. Tr. of
> May 14, 2015 at 44:22-45:2, 45:10-16; Wang Decl., Ex. C, F. *This
> implicates possible violations of federal criminal laws by MCSO
> personnel in the course of the MCSO-Montgomery investigation.*
> See, e.g., 18 U.S.C. §§ 793(b)-(f) (taking or communication of
> documents relating to national defense); 798 (disclosure of
> classified information); 1503 (intimidation of federal court and
> obstruction of justice); 1509 (obstruction of court orders); 1924
> (unauthorized removal of classified information); 2511
> (intercepting electronic communications); 2701 (unlawful access to
> stored communications).

*(Emphasis added.)*

This discussion concerning the "MCSO-Montgomery investigation" clearly implicates Montgomery in the "MCSO-Montgomery investigation." Of course under the duty of loyalty and confidentiality, this attack is a violation even if the statement is true.

To make matters worse, in her affidavit attached to the ACLU's Opposition, Cecellia Wang sponsors, promotes and endorses an article entitled "Joe Arpaio's Investigating Federal Judge G. Murray Snow, DOJ, Sources Say, and Using a Seattle Scammer To Do It." from The Phoenix New Times trashing Dennis Montgomery in Paragraph 3 on Page 1.

On Pages 8 to 9 of the pleading, the ACLU by Ms. Wang and Mr. Pochoda further attacked Dennis Montgomery, including by promoting, drawing attention to, and relying upon disreputable and false blog postings that further defame him.[7]

> The *Phoenix New Times* article that the Court introduced as an
> exhibit indicated that the MCSO-Montgomery investigation was
> aimed at developing a conspiracy theory to discredit the Court
> during that same time period (October 2013 through April 2015) in
> which the movants had expressed defiance of the Court's
> Supplemental Permanent Injunction, in which there were numerous
> instances of noncompliance with the Court's orders, and leading up

---

[7]    A newspaper article is of course normally inadmissible hearsay.

to the April evidentiary hearing on contempt charges and remedies. Documents later produced by the Defendants support the newspaper account that—contrary to the testimony of Arpaio and Sheridan—the MCSO-Montgomery investigation targeted the Court. Wang Decl., Ex. B, F. The documents also reveal that MCSO personnel continued to press Dennis Montgomery for results up until the eve of the contempt hearing, even though they had already concluded that he was not credible. Wang Decl., Ex. C, D, E. The evidence thus suggested that the MCSO-Montgomery investigation might be an attempt to undermine the Court's authority rather than comply with its lawful orders.

Furthermore, attorneys Ms. Wang, Mr. Pochoda, Mr. Segura and Mr. Bendor have also worked against the interests of Dennis Montgomery in other court proceedings, pleadings and hearings. Mr. Montgomery sought to intervene in the litigation to stop the repetition of those very same smears and defamation in the *Melendres* litigation which he previously sought the ACLU's legal help and representation to refute. However, the ACLU attorneys opposed Montgomery's efforts to intervene, including by smearing his chosen current attorneys as much as they smear Montgomery. Therefore, the legal actions in court by those ACLU attorneys and the ACLU also violate those attorney's ethical, fiduciary and professional responsibilities.

Ms. Wang, Mr. Pochoda, Mr. Segura and Mr. Bendor have thus violated the Arizona Rules of Professional Conduct, including but not limited to ER 1.6, ER 1.7 and ER 1.9, such as:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client:

(1) whose interests are materially adverse to that person; and

(2) about whom the lawyer had acquired information protected by ERs 1.6 and 1.9(c) that is material to the matter;

unless the former client gives informed consent, confirmed in writing.

And see also: ER 1.10.    Imputation of Conflicts of Interest:  General Rule

> (a) While lawyers are associated in a firm, none of them shall
> knowingly represent a client when any one of them practicing
> alone would be prohibited from doing so by ERs 1.7 or 1.9, unless
> the prohibition is based on a personal interest of the prohibited
> lawyer and does not present a significant risk of materially limiting
> the representation of the client by the remaining lawyers in the
> firm.

As a result, the ACLU is required to immediately withdraw from *Melendres v. Arpaio*, a case that is already concluded on the merits as of October 2013, but which was continued and is ongoing as contempt proceedings.  The ACLU must further take whatever action is required to mitigate the damage already done.

In my entire career as an attorney, as the founder of the legal ethics groups Judicial Watch and Freedom Watch, I have never seen a violation of professional ethics and the fiduciary duty between attorney and client of this magnitude and scope. The ACLU and its attorneys must immediately withdraw from representation in the case and immediately notify Judge G. Murray Snow and appropriate local, state and federal authorities of its unethical and illegal actions.

Sincerely,

Larry Klayman
Freedom Watch, Inc.
2020 Pennsylvania Avenue, N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com


cc: Mr. Dennis Montgomery

Exhibit E

CECILLIA D. WANG
*DIRECTOR*
IMMIGRANTS'
RIGHTS PROJECT



*Via Facsimile and U.S. Mail*

June 25, 2015

Larry Klayman
Freedom Watch, Inc.
2020 Pennsylvania Ave., N.W.
Suite 345
Washington, DC 20006
Fax: (310) 275-4963

**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
CALIFORNIA OFFICE
39 DRUMM STREET
SAN FRANCISCO, CA 94111
T/415.343.0775
F/415.395.0950
CWANG@ACLU.ORG

NEW YORK OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
WWW.ACLU.ORG

Dear Mr. Klayman:

        I am in receipt of your letter of June 22, 2015 and am responding on
behalf of the American Civil Liberties Union Foundation and the ACLU
Foundation of Arizona. We disagree with the factual and legal claims in your
letter and see no reason to take any further action.

Sincerely,

Cecillia Wang

cc:      Daniel Pochoda